## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Julie Denny, individually and on behalf of H.A.B., | Civil File No. |
| Plaintiffs, | |
| v. | |
| Bertha-Hewit Public Schools, Independent School District No. 786, | **PLAINTIFF'S COMPLAINT AND PETITION ON APPEAL** |
| Defendant. | |

---

Julie Denny individually and behalf of her minor daughter, H.A.B., for their Complaint and Petition on Appeal, state and allege as follows:

### PRELIMINARY STATEMENT

1.      H.A.B. is a nine year old, completing her fourth grade, who lives with her family in Bertha, Minnesota.

2.      H.A.B. was diagnosed in infancy with Down syndrome, which affects her functioning in all aspects of her life.  She has been identified as eligible for special education as a student with developmental disabilities and a speech impairment.  Because of her developmental disabilities and speech impairment, H.A.B.'s communication skills are significantly delayed.

3.      H.A.B. has had a very difficult public school education at Bertha-Hewitt Public Schools, despite the love and support of her family, friends and community, as well as her strengths as a loving, relationship-oriented, and socially engaging child.

4.      H.A.B. has attended Bertha-Hewitt Elementary for her entire education, despite years of reported and prosecuted physical and emotional abuse by paraprofessionals employed by Bertha-Hewitt Public Schools.

5.      Julie Denny ("Ms Denny" or "Plaintiff"), H.A.B.'s mother, was told of the abuse during H.A.B.'s first grade when a Bertha-Hewitt paraprofessional disclosed that she was using a spray bottle to spray H.A.B. in the face whenever H.A.B. did not comply with her educators.

6.      Ms Denny, upon discovering this information, met to discuss the report with Bertha-Hewitt in an individualized education plan ("IEP") meeting.  Prior to the IEP team meeting, the Bertha-Hewitt Public Schools Superintendent Brian Koslofksi instructed Ms Denny that she was not to discuss the incident with anyone and not to raise it during the meeting.  Bertha-Hewitt agreed to Ms Denny's request to remove the paraprofessional from further contact with H.A.B.

7.      Bertha-Hewitt did not initiate an investigation into the claims of abuse or the training and supervision that it provided to its paraprofessionals.

8.      Near the completion of H.A.B.'s second grade, the Bertha-Hewitt paraprofessional assigned to H.A.B. was reported to be slapping H.A.B. in the face as a form of punishment and discipline.  One of the slapping incidents was captured on a video camera in the school.

9.      The Superintendent received a report of the video-tape and filed a maltreatment complaint with the Minnesota Department of Education.  Ms Denny was not informed by Bertha-Hewitt that H.A.B. had been maltreated or that a maltreatment report had been filed.  She became aware of the maltreatment complaint when a representative from MDE contacted her to inform her that a maltreatment investigation into the incident was being opened.

10.     The allegation also gave rise to the Todd County Sheriff's Office investigation criminal liability.  The paraprofessional was removed from her position, removed from the school and subsequently criminally charged and pleaded guilty.

11.     During the investigation, Ms Denny returned H.A.B. to school because of her long-term friendships at school and to avoid punishing H.A.B. by removing her from her school and community.  However, Bertha-Hewitt declined to provide Ms Denny any reports or statements regarding H.A.B.'s abuse within the school.  Ms Denny made multiple requests for the data, including a written data request under the Minnesota Government Data Practices Act.

12.     After the criminal investigation was completed, Ms Denny received from the Todd County Sheriff's Office through a data practice act request, the documents, witness statements, video tape, and the maltreatment report.   The investigation revealed not only the extent of the physical and emotional abuse of H.A.B. but that it had been on-going and previously reported to a Bertha-Hewitt special education administrator.  The investigation revealed that the individual who reported the abuse much earlier than the video-taped incident was challenged and ignored by the administrator.

13.     Once the investigative files were available, Ms Denny in February 2016 served a lawsuit on H.A.B.'s behalf for damages as a result of the abuse.  Bertha-Hewitt and Ms Denny, represented by counsel, resolved the past abuse claims through a settlement agreement signed by the parties.  The Settlement Agreement was finalized and signed by the parties on April 20, 2016.  An important aspect of the Settlement Agreement was the training and supervision that was to be provided to Defendant's employees.  The training was to be completed, according to the Agreement, by September 30, 2015.  Instead, Defendant's breached this portion of the Agreement and did not provide training until November 2015.

3

14.     During this same period of time, H.A.B. returned to Bertha-Hewitt Public Schools for her third grade school year with new paraprofessionals.  H.A.B. had a very good third grade and she made progress in her education and was flourishing.  While H.A.B. continued to experience the minor challenges associated with her disabilities, Ms Denny was confident that the family and H.A.B., given H.A.B.'s success in third grade and the terms and conditions of the Settlement Agreement, could put the past abuse behind them.

15.     H.A.B. returned to Bertha-Hewitt Elementary for her fourth grade school year (2015/16). She was originally assigned the same two paraprofessionals from her third grade school year. However, the paraprofessional to whom H.A.B. and her family ascribed much of H.A.B.'s success during her third grade, was removed within the first two weeks of the school year without notice to Ms Denny.

16.     On September 15, 2015, H.A.B. was for the first time in her education, physically restrained three times in one day by education staff for challenging behaviors.

17.     Ms Denny was informed of the physical restraints when two of H.A.B.'s peers and friends reported the incidents, after returning home from school, to their parents and grandparents, expressed their fear at what happened and insisted that the parents and grandparents call Ms Denny to inform her of the restraints.  Both peers were upset and very concerned for H.A.B.'s welfare.

18.     The Superintendent reported the incident to the Minnesota Department of Education, Maltreatment Division, but once again denied Ms Denny any information about the restraints, though one of the restraints had been captured on video-tape.

19.     Defendant and its employees immediately began to call Ms Denny on a near daily basis reporting that H.A.B. was "out-of-control" behaviorally and that Ms Denny would need to either

pick H.A.B up from school or H.A.B. would be suspended or removed from instruction. While H.A.B. had in the past had minor behaviors associated with her disability and her inability to effectively communicate, the near daily reports Ms Denny received from Defendant were at complete odds with H.A.B.'s prior progress and H.A.B.'s experiences at home and in the community.

20.     H.A.B., according to Defendant's records and reports, went from being a happy successful third grader entering her fourth grade school year, to a child who was reported to be spitting, slapping, hitting, cursing, and throwing items. The only notable connection Ms Denny was able to make as a parent viewing H.A.B.'s instruction was that the increased behaviors accompanied the change in paraprofessionals working her H.A.B.

21.     It was not until after the administrative hearing, that Ms Denny discovered that the paraprofessional assigned to provide services to H.A.B. was physically assaulting, punishing and disciplining H.A.B. The administrative decision was issued on April 13, 2016. On April 18, 2016, seven non-disabled peers reported to Defendant's Superintendent that the paraprofessional was slapping H.A.B. It was subsequently discovered that not only was the assigned paraprofessional slapping H.A.B. but that she had slapped other disabled children. The peers who were interviewed also reported that the assigned paraprofessional was physically forcing H.A.B. to perform exercises such as "burpies" in gym class and when H.A.B. did not comply, the paraprofessional was pushing H.A.B. to the ground. The peers reported that the assigned paraprofessional interfered with H.A.B. and her ability to participate with her non-disabled peers.

22.     Ms Denny persisted in attempting to identify what was happening with H.A.B. in school that would explain this rapid deterioration in her functional skills. Ms Denny attended meetings with Defendant employees and asked the educators about what had changed so significantly for

H.A.B.  She asked that the prior teacher and paraprofessional be consulted.  She repeatedly stated that H.A.B. was unable to report to anyone what was happening at school and that Ms Denny was unable to know without hearing from the educators.  She also sought out a private functional behavioral assessment to understand what was happening at school with her daughter.

23.     Plaintiffs became aware that Defendant had breached the Settlement Agreement in terms of the training agreed upon between the parties.  Plaintiffs notified Defendant of its breach of the Settlement Agreement and sought enforcement of the training of Defendant's employees.

24.     After multiple meetings between Ms Denny and Defendant, without resolution to the concerns regarding H.A.B.'s disability and her public instruction, Ms Denny filed a Complaint and Request for Administrative Hearing (OAH File No. 5-1300-33173; MDE File No. 16-014H).

25.     At the time the hearing was requested, Defendant's proposal for H.A.B. was to provide her with an IEP wherein she was newly characterized as a "harm to herself and others" and send her to a more restrictive education setting.[1]  Ms Denny objected to a more restrictive setting for H.A.B. without the development of an IEP that implemented a behavior intervention plan and training and supervision of special education paraprofessionals working with H.A.B.  While an acceptable proposed behavior intervention plan ("BIP") was made a part of the IEP, Ms Denny objected to the inclusion of language that H.A.B. was a harm to herself and others, as well as the lack of training and supervision to implement the BIP.  Defendant's employees presented with Ms Denny with any information that H.A.B. was a harm to herself and others.  Instead, the language simply appeared on the document without discussion and was later retracted from the IEP when Ms Denny asked to discuss its inclusion.

---

[1]  No witness in the administrative hearing testified that H.A.B. had ever harmed herself or others or that she was in any way a danger.

6

26.     H.A.B.'s behavior continued to deteriorate in the school setting.  In addition to slapping, kicking, spitting and cursing, H.A.B. had begun to routinely wet herself (enuresis) at school. H.A.B's primary physician since infancy notified Defendant in February 2016 that H.A.B. was regressing and wetting herself as a visceral response to stress at school.

27.     Plaintiffs filed a Complaint and Request for Administrative Hearing with the Minnesota Department of Education.  James Mortenson was appointed as the administrative law judge ("ALJ").  Both parties presented evidence in the administrative hearing held on the parties on March 16, 17, and 18th.

28.     The ALJ issued the Findings of Fact, Conclusions of Law, and Order ("Decision") on April 13, 2016.  In the Decision, the ALJ either rejected or ignored all evidence submitted by Plaintiffs.  In several instances, the ALJ rebuked the Plaintiffs for not paying their own independent evaluator to attend an education planning meeting with Defendant and its employees *before* the evaluation was complete and a report had been provided, for confusing mis-dated IEP proposals, and for asserting that H.A.B. did not previously displayed the behaviors that were reported by Defendant's employees.

29.     The Decision ignored or disregarded the evidence of H.A.B.'s lack of progress in public instruction and refused to consider the significant history of physical and emotional abuse against H.A.B. by Defendant's employees.  The Decision, *inter alia*, ignored or disregarded the lack of training and supervision among the employees, the lack of positive behavior interventions used with H.A.B., the lack of compliance with state statute and rules regarding physical restraints and discipline, and the lack of access to her mainstream classroom and peers consistent with her IEP.

30.     Three business days after the Decision was rendered wherein the ALJ denied Plaintiffs any and all relief, seven fourth grade students who were friends of H.A.B.'s reported to Defendant's Superintendent that H.A.B. was being slapped and physically disciplined by her primary paraprofessional the prior week.  A subsequent investigation by law enforcement revealed that the same primary paraprofessional had slapped another disabled student across the face and was forcing H.A.B. to participate in calisthenics by pushing her to the ground and interfering with her contact with her non-disabled peer friends.

JURISDICTION AND VENUE

31.     This action is an appeal of an April 13, 2016 state level administrative due process hearing decision, held pursuant to the federal Individuals with Disabilities Act ("IDEA") and corresponding Minnesota law. *See* 20 U.S.C. § 1415(i)(2)(A); *see also* Minn. Stat. § 125A.091, subd. 24. This Court has jurisdiction over the action under 20 U.S.C. § 1415(i)(2) and 28 U.S.C. § 1331.

32.     Venue in this district is authorized by 28 U.S.C. § 1391(b) because Plaintiffs are residents within this Judicial District, Bertha-Hewitt Public Schools, Independent School District No. 786 has its principal place of business within this Judicial District, and a substantial part of the events or omissions giving rise to the Complaint occurred within this Judicial District.

PARTIES

33.     Plaintiffs Julie Denny ("Ms Denny", "Mother" or "Parent") is the natural parent and guardian of H.A.B. (jointly referred to as "Plaintiffs") and both reside within the legal boundary of ISD 786.

34.     Bertha-Hewitt Public Schools, Independent School District No. 786 ("District" or "Bertha-Hewitt" or "ISD No. 786") is a political subdivision operating in Todd County,

8

Minnesota, with its District office located at 310 Central Ave S, Bertha, Minnesota 56437. The

District, under the management and control of its duly elected School Board, administers the

.public schools contained within its boundaries.

## STANDARD ON APPEAL

35.    The District Court's most recent statement of the standard on appeal set forth in *R.M.M.*

*v. Minneapolis Public Schools*, No. 15-cv-1627, slip op. at 7 (D. Minn. February 8, 2016), is as

follows:

> Under the IDEA, a party aggrieved by an ALJ's decision has "the right to bring a civil
> action with respect to the complaint presented pursuant to [the IDEA], which action may
> be brought in any State court of competent jurisdiction or in a district court of the United
> States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). The
> party challenging the ALJ's decision bears the burden of proof. E.S. v. Indep. Sch. Dist.
> No. 196, 135 F.3d 566, 569 (8th Cir. 1998). The court "is to make an independent
> decision of the issues based on a preponderance of the evidence, giving 'due weight' to
> the state administrative proceedings," Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607,
> 610 (8th Cir. 1997) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 205-06 (1982)), but
> the court applies a de novo standard of review to questions of law, see Jana K. ex rel. Tim
> K. v. Annville-Cleona Sch. Dist., 39 F. Supp. 3d 584, 594 (M.D. Pa. 2014) (citing
> Warren G. v. Cumberland Cnty. Sch. Dist., 190 F.3d 80, 83 (3d Cir. 1999)) ("The district
> court's review of the hearing officer's application of legal standards and conclusions of
> law . . . is subject to plenary review."); C.T. v. Verona Bd. of Educ., 464 F. Supp. 2d 383,
> 385 (D.N.J. 2006) ("When reviewing an ALJ decision in an IDEA case, the district court
> applies a *de novo* standard to questions of law.").

*Id.* at 7.

36.    The Plaintiffs appeal the administrative decision because the decision was not based on

the preponderance or weight of the evidence nor on applicable legal standards.

## PROCEDURAL BACKGROUND

37.    The Plaintiffs filed a Complaint and Request for an Administrative Hearing with the

Minnesota Department of Education ("MDE") on January 25, 2016.  The MDE and Office of

Administrative Hearings ("OAH") appointed James Mortenson as the Administrative Law Judge

("ALJ") to hear *Julie Denny, on behalf of [H.A.B.] v. Bertha-Hewitt Public Schools, Independent School District No. 786*, OAH File No. 5-1300-33173; MDE File No. 16-014H.

38.     Ms Denny was seeking to have H.A.B. moved to another public school for a fresh start, be awarded compensatory education services for the regression and loss of educational benefit, to order research-based behavioral interventions for H.A.B., as well as training, support and supervision of regular and special education staff working with H.A.B. *First Pre-Hearing Order*, OAH File No. 5-1300-33173; MDE File No. 16-014H, (January 25, 2016).

39.     In the First Pre-Hearing Order, the ALJ ordered Defendant to "[e]nsure Parent has been provided access to, or copies of, all education records and ensure all required notices, information on Student's educational progress, and any other information the Administrative Law Judge request, is shared between the parties and copies provide to the Administrative Law Judge." *Id*.

40.     Consistent with the federal statute, the parties participated in a Resolution Session on January 29, 2016 to attempt to resolve issues presented in the administrative hearing.  20 U.S.C. § 1415(f)(1)(B). The Defendant's proposed resolution was to either send H.A.B. to a more restrictive setting in a neighboring school (or move H.A.B. to a segregated special education program. *Ex.* 26; *S57; S56 p. 597-98.*

41.     The ALJ issued a second pre-hearing order on February 5, 2106 setting forth the dates for the exchange of information and hearing dates.[2]  Over the objection of Plaintiffs, the ALJ recast the issue for the administrative hearing as follows:

> Did the School District deny Student a free appropriate public education (FAPE) when, during the 2015-16 school year, school personnel did not follow Student's individualized education program (IEP) when addressing challenging behaviors, and the IEP was not

---

[2]   Discovery by either party is not permitted in special education administrative hearings.  See Minn. Stat. § 125A.091 and the Minnesota Administrative Procedures Act and Rules; Minn. Stat. Ch. 14; Minn. Rule 1400, *et seq*.

revised to provide special education and related services, supplementary aids and services, and staff supports to deal with Student's challenging behaviors.

*Second Pre-Hearing Order*, OAH File No. 5-1300-33173; MDE File No. 16-014H, (February 5, 2016).

42.     An administrative hearing was held on March 16-18, 2016.   The ALJ issued a decision on April 13, 2016.[3]

43.     Plaintiffs timely appealed the administrative decision through this Appeal and Complaint.

## FACTS

44.     H.A.B. has been diagnosed with Down syndrome, Hypothyroidism, Sleep Apnea, Conductive Hearing Loss with pressure equalizing tubes, and repaired Atrial Septal Defect.  *Ex. S23*.  She has been receiving special education under the Developmental Cognitive Disability – Mild to Moderate ("DCD") as her primary disability and a secondary disability of Speech and Language Impaired ("Sp/Lang").  *Ex. S4*.  Hannah has delays in her gross and fine motor skills, memory, recall and other cognitive functions, interpersonal and communication skills. *Ex. S4; S11; S23*.

45.     H.A.B. is a vulnerable child with special needs who was subjected to physical and emotional abuse by Defendant's employees within Bertha-Hewitt Elementary.  H.A.B. ability to communicate is compromised by her disability.  She is primarily non-verbal and unable to accurately report what happens to her in any given environment.  In one instance of physical abuse, Defendant's employee faced criminal charges for her conduct.  Despite the physical and emotional abuse that resulted in criminal charges and a lawsuit,[4] Ms Denny and Defendant's

---

[3]  The ALJ Decision was remitted electronically to the Parties through counsel.  Plaintiffs' counsel did not receive the electronic copy but did receive the hard copy via U.S. mail.  *Declaration of Margaret O'Sullivan Kane*.
[4] A settlement agreement was reached between the Parties regarding the past abuse. *Ex. S58; Trans. 369-73; Ex. S52, S53, S55*.

employees worked together to restore trust and return H.A.B. to school. As a result, H.A.B. did

very well at Bertha-Hewitt Elementary for her third grade school year (2014/15).  While H.A.B.

does experience challenges in all areas of functioning in the education setting as a result of her

diagnosis of Down syndrome, she made demonstrable progress in her education and in all areas

of functioning during her third grade. *Ex. S18; Trans. 381-82; Trans. 387*. H.A.B. was,

according to Defendant's records, progressing in her education in all areas.  *Id*.

46.     During Hannah's third grade school year (2014/15) the education records reflected

progress.  BH produced written progress reports for Hannah's first and second grades.  *Ex. S1;*

*S5; S13*.  According to the progress reports H.A.B. was making identifiable progress

academically, socially, emotionally and behaviorally.  *Id*.  The sole progress report for H.A.B.'s

fourth grade reflected that H.A.B. was not making progress in any of her identified goals. Ex. 19.

Her lack of progress during the fourth grade as at odds with the progress she had made near the

conclusion of her third grade year:

> Hannah's social behavior varies from day to day.  Her peers are wonderful with her and
> seek out opportunities to engage with her in her school setting.  She generally can be with
> her peers without pulling hair, hitting, or kicking as the frequency of negative behaviors
> with peers has gone done (sic) significantly.  She will demonstrate negative behaviors
> with staff when moving to task/activity that is of less preference.  She does appear to be
> more "tired out" in the afternoon and her schedule has been geared accordingly.
>
> ***
>
> She has shown significantly less negative/aggressive behavior toward with peers.  Also
> she had shown less aggressive behaviors with staff especially in the morning structured
> setting.  She does continue to struggle with behaviors more during less structured specials
> in the afternoon.

*Ex. S18*; *Ex. 8A, p. 9 of 19*.  Ms Denny testified that H.A.B.'s third grade went very well.  *Trans.*

*387-89*. There were no disciplinary referrals, no incident or critical incident reports and no calls

to pick H.A.B. up from school.  *Id*.  Defendant produced no records reflecting that H.A.B.

required discipline, suspension, restraint or removal from any classrooms during her third grade.

47.     Upon entering her fourth grade school year (2015/16, Ms Denny recognized that

H.A.B.'s fourth grade school year was not going well when she discovered that multiple physical

restraints were used with Hannah in school on September 15, 2015. *Trans. 384-85; Ex. S29 and*

*S30*.  At the time of the restraints, BH had breached the Settlement Agreement reached between

the parties regarding training and supervision of education staff. *Ex. S58, S59, and S60*.

48.     Defendant's employees testified that the paraprofessional assigned to H.A.B. was not

available for portions of the day, including lunch and recess.  As a result, multiple substitute

paraprofessionals were brought in to cover those periods of time during the school day when the

primary paraprofessional was absent for her lunch, a break or absent from school.  According to

Defendant's employees, H.A.B.'s behavior became challenging when the primary

paraprofessional was not available.  However, the independent evaluator, Nic Collette, who

conducted direct observations of the paraprofessionals working with H.A.B. concluded that there

were no consistent interventions or services being provided by the multiple paraprofessionals

working with her.  He further concluded that the information collected by Defendant's

employees was not useful for addressing H.A.B.'s needs at school.  He recommended training

for Defendant's employees in positive behavior interventions and crisis prevention interventions.

49.     After the physical restraints were used, Defendant's employees and Ms Denny met and

agreed upon a functional behavioral assessment with the purpose of identifying what was

contributing to the escalating behaviors. The parties agreed to increase the special education

service minutes to address any fatigue that may be contributing to her behavior.  *Ex. 8a*.  The

additional service minutes was not an effective intervention and served to simply remove H.A.B.

from further contact with her peers.  The administrative record in this matter reflected that

13

H.A.B.'s challenging behavior took place in the special education classroom and during transitions when her assigned paraprofessional was not available.  Her behavior continued to escalate and Ms Denny was being called daily by Mr Koep reporting on H.A.B.'s behavior and asking her to pick H.A.B. up each week.

50.     The next IEP team meeting on December 2, 2015, resulted in an IEP and BIP that characterized H.A.B. as a harm to herself and others and was rejected on that basis. *Ex. 17*.   The IEP was not provided to Ms Denny until December 30, 2015, after multiple requests were made and in violation of the procedural safeguards.   The IEP Agenda for the December 2, 2015 meeting does not reflect any concern that H.A.B. was a harm to herself or others or that any emergency interventions needs to be developed.  *Ex. S56, p. 574*.  No one in the IEP team meeting discussed that H.A.B. was a harm to herself and others.  *Ex. S56, pp. 593-94*.  This stigmatizing and inaccurate language was nevertheless introduced into the proposed IEP received by Plaintiffs on December 30, 2015.

51.     Throughout this matter, Defendant and its employees produced multiple IEPs with procedural notices bearing the same December 2, 2015 date despite repeated requests to have the amended IEPs correctly dated and the legal obligations attendant on accurate procedural notices. Defendant and its employees persisted in producing amended IEPs without noting the date of the amendments or submitting updated notices.  *Ex. S5 and 5*.  The consequence was that multiple versions of an IEP that bore changes from draft to draft were introduced into the record over the objection of Plaintiffs.  By way of example, Defendant introduced over Plaintiffs objections a BIP plan attached as the proposed IEP.  *Ex. 17a*.  This version bore the date of 12/2/15, as did all of the other versions of the IEP that were sent to Ms Denny. Plaintiffs again requested that Defendant's employees *to date* the IEPs to reflect revisions and amendments.  *Trans. 514-15*.  In

one instance, Defendant employees introduced into the administrative record as the initial

proposed IEP from the December 2015 meeting with the "harm to self and others" language

expunged.  However, Ms Denny had already responded to the initial IEP and objected to the

language.  *See Ex. 17a; Trans. 524; Ex. S56, p. 593*.

52.     The video-tape of the restraints, which were not provided to Ms Denny until five months

later at the resolution session in January 2016.  The video-taped restraints, entered into the

record, show that Defendant's employees did not know the most rudimentary of positive

behavior interventions, crisis prevention interventions or the rules and regulations related to

using physical restraints.  *Ex. S31*.  Defendant's employee testimony confirmed that the

employees were relying upon one another and that none of Defendant's employees involved had

been properly trained in physical restraints and crisis prevention interventions.  *Trans. 566;606;*

*325; 706*.  The administrative record reflected that the CPI training that was to be provided

consistent with the Settlement Agreement, did not take place until well after the physical

restraints were used with H.A.B.  Collette confirmed that Defendant's employees conduct did not

conform to known CPI professional standards and the rules and regulations related to physical

restraints.  *Trans. 681-82*.  The Defendant's Superintendent also testified that the restraint was

unlawful thus prompting him to make a maltreatment report to the Minnesota Department of

Education, Maltreatment Division.  Remarkably and contrary to the expert testimony, the ALJ

concluded that the restraint was not unlawful and that H.A.B. was "kicking" in the video.   The

ALJ did not address the testimony from Defendant's employees that H.A.B. had already

complied with all of their requests (*trans. 562*) but was nevertheless placed into a crossed-arm

physical restraint.  At the time H.A.B. entered the video, Defendants have restricted her physical

movement by crossing her arms over her chest and holding them in place.  *Ex. S31*.  There was

no testimony explaining why H.A.B. was already in a physical restraint at the time she dropped to the floor and another improper physical restraint was applied.

53.     Defendant's employees began to report H.A.B.'s significant behavioral deterioration at school.  During her third grade, H.A.B. had no incident reports.  During her fourth grade, H.A.B. had been issued 21 incident reports.  Ms Denny met several times with Defendant's employees to discuss H.A.B.'s challenges and to determine any changes that had been made between H.A.B.'s third and fourth grade that could explain her deteriorating behavior.  The only change that Ms Denny was able to identify in H.A.B.'s education was the change in paraprofessionals working directly with H.A.B. all during the school day.  Ms Denny expressed, *inter alia*, concern that the paraprofessional personnel supporting H.A.B. had changed and that perhaps the prior paraprofessional would have more success with H.A.B.  In the alternative, Ms Denny asked Bertha-Hewitt personnel to contact H.A.B.'s third grade teacher and paraprofessional to discuss what that staff had been doing with H.A.B. that had been so successful.  After multiple meetings, the Parties were unable to resolve some of their differences and H.A.B.'s behavior continued to deteriorate.

54.     In the preliminary meetings, the Parties agreed to provide H.A.B. with more "down time" in the afternoon away from her peers.  The Parties discussed that perhaps H.A.B. was experiencing fatigue during the school day.  The amended IEP reflected that H.A.B. would be removed from her mainstream for one hour in the afternoon.  *Ex. 8a*.  When the additional down time was not successful and H.A.B.'s behavior continued to deteriorate, the Parties agreed to complete a functional behavioral assessment ("FBA").[5] As the FBA was being conducted,

---

[5]   The use of FBA is implied when the student's behavior impedes learning processes and the IEP team is considering the use of PBIS [Positive Behavior Intervention Services] and other strategies. Functional behavior assessment (FBA) is a result-oriented process that explicitly identifies problem behaviors, the specific actions that reliably predict the occurrence and non-occurrence of problem behaviors, and how the behaviors may change across

H.A.B. continued to regress.  Ms Denny continued to be contacted on a daily basis by Mr Koep to report that H.A.B. was out of control and needed to be picked up.  Whenever a family member or friend arrived to pick up H.A.B., she would appear fine.

55.     As a result of the prior abuse and Defendant's unwillingness to provide Ms Denny with any explanation or information about H.A.B.'s school day, Ms Denny asked to have an independent functional behavioral assessment done for H.A.B. at school.  Defendant offered to pay for the independent assessment but was requesting significant restrictions on the assessment so Ms Denny agreed to pay for it to ensure its independence.  Consequently, Ms Denny hired Nic Collette ("Collette"), Behavior Specialist, with Opportunity Matters in Sartell, Minnesota. *Ex. S23*.

56.     Collette conducted the independent assessment in late November 2015.  *Id*.  This was the same time frame when the persistent telephone calls from Koep ceased for a time.

57.     Defendant's requested an additional IEP team meeting scheduled for December 2, 2015. Defendant requested that Collette attend the IEP team meeting.  Ms Denny could not afford to pay for Collette to attend an IEP team before he had completed his evaluation and made recommendations.  Ms Denny communicated this issue with Defendant and asked that an IEP team meeting be scheduled for *after* Collette completed his assessment to make good use of his time and expertise.  Defendant's employees nevertheless went forward with the IEP team meeting on December 2, 2015.  The result of the IEP team meeting was an IEP with an attached behavior intervention plan ("BIP") that characterized H.A.B. as a "harm to herself and others."

58.     At the IEP team meeting, Ms Denny specifically asked Defendant's employees to speak with H.A.B.'s prior teacher and paraprofessional to see if they had any recommendation for

time. OCEP Technical Assistance Center, *When to use Functional Behavioral Assessment?A State-by-State Analysis of the Law*.  http://www.pbis.org/Common/Cms/files/pbisresources/EvalBrief_Oct2015.pdf

services. Defendant's employees declined. Ms Denny asked if the paraprofessional frorm third

grade could be assigned back to H.A.B. Defendant's employees declined. Ms Denny offered to

have Amanda Parker, H.A.B.'s life-long personal care assistant, accompany H.A.B. throughout

the school day and assist with ensuring communication and interventions were similar across the

home and school. Ms Denny asked to see any documentation regarding how frequently H.A.B.

was taken out of the regular education classroom and being sent home. Defendant's employees

declined to provide the information. Ms Denny asked to see any documentation about what

services and interventions were being used when H.A.B.'s challenging behavior arose.

Defendant's employees declined.

59.     Ms Denny was attempting to reconcile all the progress H.A.B. made in third grade with a

child who characterized by Defendant's employees as a harm to herself and others. H.A.B.'s

behavior at home and in the community had not changed and she continued to be an active,

engaging participant in all aspects of her life with the exception of school. Ms Denny expressed

concern that the education staff may not be properly trained or supervised to provide H.A.B. with

the interventions that had previously proven successful.

60.     Collette's report was provided to Ms Denny on December 15, 2015. *Ex. S23*. A copy of

the report was provided to Defendant.

61.     Collette reported that the paraprofessional assigned to H.A.B. was "described as being

able, when others are not, to interpret what H.A.B. is saying, as well as respond with more

confidence when lower severity challenging behaviors occur." *Id*. The paraprofessional

described what she did with H.A.B. to Collette as "setting appropriate boundaries with her

behavior using gentle, proactive and positive statements (e.g., "look at me, please"), and quickly

identifying what activities she may struggle with through observation of her reaction (e.g.

increased fidgeting, verbally or passively refusing tasks demands, infrequent non-directed swearing)."

62.    Collette concluded that one of the central issues for H.A.B. is her communication and her ability to understand what is being asked of her.  Collette's report found that each of Defendant's employees was using differing communication based interventions that were not consistent or clear.   According to Collette, each paraprofessional was using their own methods for responding to H.A.B.'s challenges in school.

63.    Defendant produced a proposed IEP that included the language that H.A.B. was a harm to herself and others.  Ms Denny rejected this language as inaccurate and stigmatizing for H.A.B. Prior to the inclusion of this language into the IEP, no Defendant employee discussed with Ms Denny that Defendant wanted to include language asserting that H.A.B. was a "harm to herself or others."   Nor was this information ever set forth on any agenda for the meetings between the parties. *Ex. 15.*

64.    All of the proposal provided by Defendant's employees placed H.A.B. in a more restrictive education setting and away from her non-disabled peers.  Ms Denny objected to a more restrictive setting without a considered approach to interventions for H.A.B.

65.    Ms Denny filed a Complaint and Request for Hearing with the Minnesota Department of Education on, after her informal efforts to address H.A.B.'s deteriorating behavior at school and her education needs

66.    At the time the Complaint was filed, Ms Denny retained and paid for an independent education evaluation from Nic Collette at Opportunity Matters. *Ex. S23; Trans. 411.*  An IEP team was scheduled and held between the parties on December 2, 2015. *Ex. S56; Ex. 14.*   As a result of the IEP team meeting and BH's functional behavioral assessment, BH proposed an IEP

and behavioral intervention plan ("BIP").  The IEP and BIP was not provided until after

Student's counsel requested the documents on December 18th and 30th of December 2015. *Ex.*

*S56, p. 591, 592*.  Ms Denny, through counsel, responded with concerns the day following IEP

team meeting.  *Ex. S56 p. 589*. She formally responded to the IEP and BIP proposal on January

6, 2016, with her objections.  *Id. at 593*. Ms Denny also provided BH with a copy of independent

education evaluation on January 6, 2016. *Id*.  She also noted her request for Mr Collette to come

into BH and train education staff.  *Id.*  Among the objections expressed, Ms Denny did not agree

with the characterization of Hannah as a "harm to herself and others" and asked for

documentation regarding Hannah's participation in the mainstream classroom with her peers.  *Id*.

67.     At the time the IEP team meeting was scheduled, December 2, 2015, Mr Collette had not

yet completed or provided the independent FBA.  *Ex. S23; Trans. 412 and 734*.  Ms Denny

informed BH, prior to the meeting, that the private FBA had not yet been completed.  *Trans. 412.*

68.     The resulting proposed IEP and BIP from the December 2, 2015 were not agreed upon by

the parties as Ms Denny objected to the inclusion of the language that H.A.B. was a harm to

herself and others and was waiting to receive information about how frequently H.A.B. was

removed from the mainstream and her non-disabled peers.

69.     After Plaintiffs provided Defendant's employees with Collette's report and

recommendations, Defendant did not hold IEP team meeting to discuss the private assessment or

Ms Denny's objections.  *Trans. 411*. Instead, Defendant's employees next met with Ms Denny in

a mandatory resolution session. *Second Pre-hearing Order.*  Defendant's employees asked that

Mr Collette attend the mandatory Resolution Session[6] rather than schedule an IEP team meeting

for education planning purposes.  Defendant's proposed was to remove H.A.B. to a neighboring

---

6   The Resolution Session is a federally mandated "settlement conference" between the parties and ***not*** an
individualized education program planning meeting where IEP team members are required to attend.

public school in a more restrictive setting or  place H.A.B. an education environment completely segregated from her peers.  *Ex.* 26; *S57; S56 p. 597-98*. Ms Denny rejected the placement in the neighboring school district of Browerville because of the experience of the lack of resources available at Browerville.  *Ex. S57; Trans. 491-92*.  At the time of the discussion of the Browerville placement, Defendant did not disclose to Plaintiffs that the placement at Browerville would include a more restrictive setting.  *Ex. S57*; *S56 p. 597-98*. This was not disclosed or identified to Ms Denny until Eric Koep testified to the more restrictive setting during the administrative hearing.  *Trans. 102*.

70.     By the time an administrative hearing was held, H.A.B.s mental health, education and behavior skills were in steep decline and rapidly regressing.  *Ex. S56, p. 600*.  H.A.B. was beginning to wet herself with regularity as a manifestation of her distress.

71.     Defendant's resolution session proposal was to segregate H.A.B. into a level IV segregated setting rather than address the programming and services, modifications and accommodations, and staff and training challenges present in the least restrictive education environment.  *Ex. 26*.

72.     Defendant's employees deliberately prevented Ms Denny from receiving information related to the treatment her daughter received throughout her education with Defendant. Defendant and its employees refused to disclose information included in H.A.B.'s education records and the video-taped incidents of H.A.B. in school.  Despite the ALJ order, Defendant's employees never produced any education record reflecting H.A.B.'s attendance at school and removals from the mainstream classroom and activities.  By deliberately withholding education records relevant to the provision of a free appropriate public education, Defendant and its employees impaired Plaintiffs ability to sustain its burden of proof in the administrative hearing.

73.     Defendant and its employees deliberately interfered with Plaintiffs' legal representation by refusing to provide documents related to H.A.B.'s education and education claims.  Despite multiple formal requests that all communications related to H.A.B.'s education programming proceed through H.A.B.'s counsel, Defendant and its employees refused.  Instead, on many occasions education records that had pending deadline and would impact H.A.B.'s education rights were sent to Ms Denny without copies to counsel.  Defendant's employees persisted in telephoning Ms Denny after she asked for communications to proceed through legal counsel.  Defendant and its employees also refused to accurately date IEP proposals when Ms Denny's counsel requested.  *Ex. S56, p. 485-87.* Instead, Defendant's employees issued multiple drafts of an IEP with subtle language changes bearing the same date – 12/2/15.  The ALJ admitted into the record a proposed IEP draft that reflected it was submitted to Plaintiffs on December 2, 2016 when it was actually submitted in response to Plaintiffs' correspondence dated the January 6, 2016.  See *Ex. 17* and *Trans. 514-19* and *Ex. 17.*

74.     Defendant and its employees deliberately interfered with the provision of services, modifications and accommodations in the education environment when it unilaterally instituted a "hands-off" policy with H.A.B. though she required a dedicated paraprofessional to provide daily hand-over-hand assistance with many of her functional skills. See *Ex. S18, p. 105* (Third Grade IEP, *Modifications Section*). As a result of the "hands off" policy, H.A.B. was denied the services, modifications and accommodations required to meet her disability-related education needs.  The hands off policy also led to an increase in H.A.B.'s challenging behavior as the paraprofessionals were not intervening and were permitting H.A.B. to escalate.

75.     Defendant routinely and on a weekly basis called Ms Denny to pick up H.A.B. from school.  When Ms Denny was not available due to employment, Defendant called other family

members and friends to pick up H.A.B. from school.  Defendant refused to keep any

documentation related to routine and persistent removals of H.A.B. from her public instruction.

76.     Defendant and its employees ceased the near daily telephone calls to Ms Denny while

Collette completed his independent assessment.  After Ms Denny rejected the December 2, 2015

IEP on January 6, 2016, the calls immediately resumed and continued up to the hearing.

77.     Defendant routinely and persistently removed H.A.B. from her public instruction in the

mainstream but refused to keep any documentation related to how often and for what periods of

time H.A.B. was missing from her public instruction.  Ms Denny visited Bertha-Hewitt

Elementary on a near weekly basis during the 2015/16 school year at different times during the

school day until Defendant restricted her visits.  At each visit, Ms Denny found that H.A.B. was

not in the mainstream classroom with her non-disabled peers and instead would be located in a

(resource) room alone with Defendant's employees.

78.     The administrative record reflected that H.A.B. was being routinely removed from recess

and lunch with her non-disabled peers. *Ex. 25; Ex. S56, p. 506.*  According to the testimony

presented by Defendant's employees, H.A.B. had regressed in her skills to the point of

persistently wetting herself, being sent home or removed from her mainstream classroom and

peers,

79.     During one of Ms Denny's visits, a shaken paraprofessional came into the resource room

where Ms Denny was visiting with the special education teacher.  The substitute paraprofessional

assigned to H.A.B. for that day did not have H.A.B. with her.  The paraprofessional stated that

after H.A.B. used the restroom, H.A.B. was in the hallway with her underwear and pants down

around her ankles.  The paraprofessional stated that she did not know what to do because

Defendant's employees had been told by Koep that there was a complete "hands-off" policy with

H.A.B.  Ms Denny never asked for a hands-off practice with H.A.B. as it was contrary to addressing her instructional needs.  Ms Denny told the paraprofessional that H.A.B. requires hand-over-hand assistance with redressing herself after using the restroom, as set forth in the IEP.

80.     Once Ms Denny began to raise concerns about H.A.B.'s public instruction, Ms Denny was informed that she could no longer visit the school elementary school without first making an appointment.

81.     Plaintiffs, in the administrative hearing, sought to have H.A.B. fresh-started at a neighboring school district (Ferndale), compensatory education services for the lack of progress H.A.B. made during the school year, behavioral interventions based on accurate data, and training and supervision of special education personnel.

82.     The evidence, and weight of the evidence, presented in the administrative hearing supported each of Plaintiffs' contentions and allegations.  The evidence reflected that H.A.B. had been successful in her prior school year and that her behavior deteriorated shortly after her paraprofessional from the prior year was removed from providing services.  The evidence also reflected that H.A.B.'s behavior continued to deteriorate at school to the point where she was wetting herself.  The evidence reflected that the physical restraints used with H.A.B. did not comport with any professional or legal standards and that Defendant's employees were not trained or supervised, consistent with statute, to use the highly regulated emergency interventions.

83.     Plaintiffs asked that Collette view the video tape of the restraints on March 18, 2016 just prior to his testimony.  Defendant called Collette to testify under subpoena.[7]  After viewing the

_____

[7]  Defendant issued a subpoena duces tecum and received the records electronically but did not produce the records for hearing. *Trans. 646-67.*

video-taped restraints, Collette testified that Defendant's employees improperly used physical restraints, did not know how to use proper physical holds and did not understand what an emergency meant consistent with the statute.   *Ex. S23*; Trans. 682; See also, Minn. Stat. § 125A.0942.  He had previously recommended that Defendant's employees revisit their professional and statutory obligations.  *Ex. S23*.

84.      The ALJ in this matter did not identify or apply any known professional or legal physical restraint standards. See Minn. Stat. § 125A.0941(b).  Nor did the ALJ identify and apply the legal requirements related to training and supervision of paraprofessionals as set forth in Minnesota statute.  Minn. Stat. § 125A.08(c)(1)-(3).  Rather than order training and supervision as requested by the Plaintiffs, the ALJ denied the relief based upon Defendant's oral assertion that it would complete the training.  No enforceable agreement or ALJ order exists to ensure the training and supervision is provided.

85.      Collette confirmed Ms Denny's position for H.A.B.'s education programming that rather than remove H.A.B. to a more restrictive education setting, Defendant needed to train and supervise its employees to provide effective and research-based interventions with H.A.B.

86.      The evidence produced reflected that H.A.B.'s functional skills at school had deteriorated.  Ms Denny produced evidence that H.A.B. had been toilet trained two year previous and had no record of wetting accidents.  Nevertheless, H.A.B. was increasingly wetting herself at school.  Dr Shaneen Schmidt, H.A.B.'s life-long pediatrician testified to the damage that was being done to H.A.B.  On February 3, 2016, Dr Shaneen provided Defendant with the following correspondence:

> [H.A.B.] has been struggling with daytime enuresis during the school year.  She has no incidents of enuresis at home or during the day when she is not in school.  I believe that she has some type of trigger or stressor that is bringing on this event.  I am requesting that the school keep track of events that occur within 1 hour of her daytime enuresis.  I

would like to see if we can identify the trigger and potentially modify it so that she no longer has the enuresis.  I do not believe she is acting out but instead is having a visceral response to stress.

*Ex. S56, p. 600; Trans. at 158*.  The record reflected that Defendant's employees refused to respond or track the day time wetting at school.  *Id*.

87.     The evidence presented at hearing supported that H.A.B. was not in her mainstream classroom consistent with her daily class schedule and IEP.  In fact, H.A.B.'s mainstream teacher, Jessica Flock, testified that between September and November 2015, she was emailing the special education personnel to locate H.A.B. for attendance purposes.  *Ex. S56, p. 539,545, 550; Trans. at 219*.  According to the class schedule, H.A.B. was to be in the mainstream setting with her peers throughout her school day.  *Ex. S56, p. 448*.

88.     The administrative hearing reflected that H.A.B.'s challenging behaviors were not evident in the mainstream classroom but rather in the special education resource room.  *Ex. S25*.[8] All but two of the 21 incidents in exhibits *S29-40* were reported by the special education teacher, Amanda Mozis and substitute paraprofessionals.  See *Ex S40; S50*.

89.     The evidence presented at hearing supported that H.A.B. was routinely sent home from school.  The ALJ, against the weight of the evidence, dismissed this evidence.  In one instance, the ALJ rejected the testimony of H.A.B.'s adult brother, Matt Grewe.  Mr Grewe testified Defendant's employees called him to pick H.A.B. up from school.  The ALJ discarded Mr Grewe's testimony because it could not be attributed to a time frame.  However, the Defendant's partial Communication Log admitted into evidence reflected the date and contact between Matt Grewe and Defendant's employees.  *Ex. S56, p. 430* (1/21/16).

---

[8]  Ex. S25 shows that the "disruptive behavior" was taking place in Ms Amanda Mozis' resource room rather than Ms Jessica Flock's mainstream classroom.  Defendant's incident reports reflect the same.  See *Exs. S29-S50*.

90.     The administrative record was clear in supporting that H.A.B. had made "insufficient progress" in each of her goals and had, in fact, regressed in many functional skill areas during the 2015/16 school year. *Ex. 19*.

## VI.  CLAIMS

### COUNT ONE

#### APPEAL OF THE ADMINISTRATIVE DECISION

91.     Plaintiffs incorporate by reference all of the preceding paragraphs as if fully set forth herein.

92.     Plaintiffs appeal the administrative decision.  The decision was not based on the preponderance of the evidence, the weight of the evidence or based on acceptable legal standards, rules and regulations.  Consequently, the decision is clearly erroneous as a matter of law.

93.     Plaintiffs also assert that Defendant and its employees is engaging in systemic violations under the IDEA by refusing to train and supervise its employees.

93      The decision was against the weight and preponderance of the evidence adduced at the hearing.  Consequently, no "due weight" should be granted to evidence presented through the administrative hearing.

94.     Plaintiffs should either be awarded the relief sought or the matter remanded for a decision on the merits based on a preponderance of the evidence and the applicable law.

### COUNT TWO

#### AMERICANS WITH DISABILITIES ACT
#### 42 U.S.C. §§ 12131-65

95.     Plaintiffs incorporate by reference all of the preceding paragraphs as if fully set forth

herein.

96.      Defendant Bertha Hewitt is a public entity at that term is used by the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12131(1).

97.      H.A.B. has a disability that substantially limits the major life activity of learning and

communicating consistent with the ADA.  42 U.S.C. § 12102.

98.      H.A.B. is a "qualified individual with a disability" within the meaning of the ADA.  42

U.S.C. § 12131(2).

99.      Accordingly, H.A.B. is entitled to full and equal access and enjoyment of and benefit

from the services, programs, and activities of the Defendant, including effective methods of

instruction free from disability discrimination under the ADA.  42 U.S.C. § 12132.

100.     Defendant failed to meets its obligations to H.A.B. to provide equal educational

opportunities to that of her non-disabled peers.  Defendant has provided H.A.B. substandard and

second-class instruction that was predicated upon Defendant's emotional and physical abuse,

physical punishment and physical discipline of H.A.B.  As a result of Defendant's actions,

H.A.B. was consistently and routinely excluded from equal participation and the benefit of

public instruction.

101.     Defendant's actions and the actions of its employees and representatives were intentional

discrimination on the basis of H.A.B.'s disability.  Defendant's employees and representatives

know or should have known that the use of emotional and physical abuse, physical punishment

and physical discipline would deprive H.A.B. of her equal access and benefit to public

instruction.  Defendant and its employees and representatives know or should have known that

students with disabilities have the right to be provided with effective education modifications

and accommodations to attain progress in each area of public instructional need free from

physical assaults as a form of discipline and punishment.  Defendant's employees and

representatives know or should have known that the use of emotional and physical abuse,

physical punishment and physical discipline would result in damage and the regression of

H.A.B.'s functional skills.  Defendant and its employees knew or should have known that

improper training and supervision of its employees would result in damage to H.A.B. and

regression of her functional skills.  Defendant and its employees knew or should have known that

physical discipline and punishment of H.A.B. by caregivers is foreseeable without proper

training and supervision.

102.    The intentional actions of Defendant and its employees toward H.A.B. constitute

disability discrimination in violation of the ADA because:

    a.   Defendant failed to maintain policies, practices and procedures to ensure compliance
        with the ADA, specifically policies, practices and procedures that provide H.A.B.
        with equal access to and benefit from the public instruction;

    b.   Defendant failed to maintain policies, practices and procedures to ensure compliance
        with the ADA, specifically policies, practices and procedures that ensure its
        employees are trained and supervised in the provision of modifications and
        accommodations in public instruction;

    c.   Defendant failed to ensure that H.A.B. was timely provided with auxiliary aids and
        services or to modify its policies and procedures to prevent discrimination;

    d.   Defendant failed to provide reasonable modifications of policies, practices and
        procedures to prevent discrimination;

    e.   Defendant failed to provide H.A.B. with effective services and programming and thus
        denied H.A.B. equal access to and the benefit of public instruction; and

    f.   Defendant failed to prevent retaliation and interference associated with the exercise or
        enjoyment of H.A.B.'s protected rights.

103.    By failing to reasonably accommodate H.A.B.'s disability in the public school with the

least restrictive interventions and using physical punishment and discipline for disability-related

conduct, Defendant and its employees discriminated against H.A.B. on the basis of her disability,

thereby violating the ADA.

104.    By proposing a level of service that would deprive H.A.B. of her contact in the mainstream, without first designing and introducing interventions and services into the mainstream setting, Defendant's employees deprived H.A.B. of her right to the least restrictive alternatives under the ADA.

105.    By intentionally withholding relevant education information, persistently contacting Ms Denny rather than H.A.B.'s legal counsel, and physically mistreating H.A.B., Defendant's employees discriminated and retaliated against Plaintiffs.

106.    Defendant and its employees further violated the ADA by subjecting H.A.B. to physically assaultive conduct.

107.    Defendant and its employees further violated the ADA by failing to have adequate policies, procedures, protocols, training and oversight so as to ensure H.A.B. was not subject to discrimination.

108.    Defendant's employees intentionally retaliated against the Plaintiffs as they sought to enforce H.A.B.'s rights under the ADA by withholding important educational information, persistently calling Ms Denny without benefit of counsel, misdating documents and subjecting Ms Denny and her family to hostile employees when H.A.B. was picked up from school.

109.    Defendant's violations of H.A.B.'s rights under the ADA were intentional, grossly, recklessly and deliberately indifferent to H.A.B.'s rights.  And as a result of Defendant's discriminatory conduct, Plaintiffs were injured.

**COUNT THREE**

**SECTION 504 OF THE REHABILITATION ACT**
**29 U.S.C. § 794**

110.    Plaintiffs incorporate by reference all of the preceding paragraphs as if fully set forth herein.

111.    Defendant Bertha Hewitt is a recipient of federal financial assistance, operate programs and activities that receive federal financial assistance and is subject to the anti-discrimination requirements found in Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, and 34 C.F.R. § 104.2.

112.    H.A.B. has a disability that substantially limits the major life activity of learning and communicating consistent with the Section 504, 29 U.S.C. § 794, and 34 C.F.R. § 104.3(j).

113.    H.A.B. is entitled to all of the protections of Section 504 including the right to full and equal participation in and benefit from her public instruction.   29 U.S.C. § 794, and 34 C.F.R. § 104.4.  Section 504 requires public schools to ensure that it provides individuals with disabilities a free appropriate public education that includes effective methods of instruction, methods of instruction to meet the individual needs of the student and an education to the "maximum extent appropriate" with non-disabled peers.  29 U.S.C. § 794, and 34 C.F.R. § 104.34(a).

114.    H.A.B. is entitled to a free appropriate public education as defined by Section 504, 29 U.S.C. § 794, and 34 C.F.R. § 104.33.

115.    Defendant actions as set forth herein constitute intentional discrimination on the basis of disability in violation of Section 504 because Defendant and its employees:

    a.    Denied H.A.B. the opportunity to participate in and derive the benefit from the education services equal to that of her non-disabled peers;

    b.    Denied H.A.B. the opportunity to participate in and derive the benefit from the education services that were equal to that of her non-disabled peers;

    c.  Denying H.A.B. the effectives aids, services and benefits provided to other non-disabled peers;

    d.  Using physical discipline and punishment unequal to the discipline and punishment of her non-disabled peers;

    e.  Limiting H.A.B.'s enjoyment in the rights, privileges, advantages and opportunities enjoyed by peers receiving the aid, benefits and services;

    f.  Depriving H.A.B. of the opportunity to gain the same benefit and sustained achievement as other peers in the most integrated education setting;

    g.  Using criteria or methods of administration that had the consequence of subjecting H.A.B. to discrimination with the purpose and effect of defeating or substantially impairing H.A.B.'s accomplishment of the goals of the program and services; and

    h.  Unilaterally determining the site and location of services that had the effect of excluding H.A.B. from contact with her non-disabled peers, excluding H.A.B. from her mainstream services and denying her the benefits of Defendant's program and services.

116.    Defendant failed to meets its obligations to H.A.B. to provide equal educational opportunities to that of her non-disabled peers.  Defendant has provided H.A.B. substandard and second-class instruction that was predicated upon Defendant's emotional and physical abuse, physical punishment and physical discipline of H.A.B.  As a result of Defendant's actions, H.A.B. was consistently and routinely excluded from equal participation and the benefit of public instruction.

117.    Defendant's actions and the actions of its employees and representatives were intentional discrimination on the basis of H.A.B.'s disability.  Defendant's employees and representatives know or should have known that the use of emotional and physical abuse, physical punishment and physical discipline would deprive H.A.B. of her equal access and benefit to public instruction.  Defendant and its employees and representatives know or should have known that students with disabilities have the right to be provided with effective education modifications

and accommodations to attain progress in each area of public instructional need free from physical assaults as a form of discipline and punishment. Defendant's employees and representatives know or should have known that the use of emotional and physical abuse, physical punishment and physical discipline would result in damage and the regression of H.A.B.'s functional skills. Defendant and its employees knew or should have known that improper training and supervision of its employees would result in damage to H.A.B. and regression of her functional skills. Defendant and its employees knew or should have known that physical discipline and punishment of H.A.B. by caregivers is foreseeable without proper training and supervision.

118.   By failing to reasonably accommodate H.A.B.'s disability in the public school with the least restrictive interventions and using physical punishment and discipline for disability-related conduct, Defendant and its employees discriminated against H.A.B. on the basis of her disability, thereby violating the Section 504.

119.   By proposing a level of service that would deprive H.A.B. of her contact in the mainstream, without first designing and introducing interventions and services into the mainstream setting, Defendant's employees deprived H.A.B. of her right to the least restrictive alternatives under the Section 504.

120.   By intentionally withholding relevant education information, persistently contacting Ms Denny rather than H.A.B.'s legal counsel, and physically mistreating H.A.B., Defendant's employees discriminated and retaliated against Plaintiffs.

121.   Defendant and its employees further violated the Section by subjecting H.A.B. to physically assaultive conduct.

122.   Defendant's employees intentionally retaliated against the Plaintiffs as they sought to

enforce H.A.B.'s rights under the Section 504 by withholding important educational information, persistently calling Ms Denny without benefit of counsel, misdating documents and subjecting Ms Denny and her family to hostile employees when H.A.B. was picked up from school.

123.    Defendant's violations of H.A.B.'s rights under the Section 504 were intentional, grossly, recklessly and deliberately indifferent to H.A.B.'s rights.  And as a result of Defendant's discriminatory conduct, Plaintiffs were injured.

## RELIEF

**THEREFORE,** Plaintiffs respectfully request that this court:

1. Reverse the administrative decision awarding Plaintiffs the requested relief and/or remand for administrative hearing directly the ALH to render a decision based on the preponderance of the evidence and accepted and applicable legal standards;
2. Declare that Defendant and its employees violated H.A.B.'s right to equal participation and the benefit from public school instruction free from disability discrimination and retaliation;
3. Award Plaintiffs compensatory damages for disability discrimination and retaliation;
4. Order the Defendant to provide training and supervision to its employees including training in positive behavior supports and services, crisis prevention interventions, rights and obligations of families and children with disabilities,
5. A Declaratory Judgment, holding that Defendant's failed to accommodate and provide services to H.A.B. consistent with the IDEA, ADA, and Section 504.
6. Grant Plaintiffs the opportunity to supplement the administrative record with evidence of events that took place subsequent to the administrative hearing;
7. Award Plaintiffs their statutory attorney's fees and expenses; and
8. Provide such other and further relief as the Court deems just and equitable.

Respectfully submitted,

**KANE EDUCATION LAW, LLC.**

Dated: 13 June 2016                       /s/ Margaret O'Sullivan Kane
                                          Margaret O'Sullivan Kane /ID # 220243
                                          Attorney for Plaintiffs
                                          420 Summit Avenue
                                          Suite 306
                                          Saint Paul, Minnesota 55102
                                          651/222-8611

**VERIFICATION**

      I verify that I have read the foregoing Complaint, and that all of the facts and statements made therein are true and correct to the best of my knowledge, and as to those facts stated on information and belief, I also believe them to be true and correct.

Dated:_____          _____
                                       Julie Denny

Subscribed and sworn to before me
this ____ day of June 2016.


_____
Notary Public

35