# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Julie Denny, individually and
on behalf of H.A.B.,

Civil No. 16-1954 (DWF/LIB)

Plaintiffs,

**MEMORANDUM
OPNION AND ORDER**

v.

Bertha-Hewit Public Schools,
Independent School District No. 786,

Defendant.

---

Margaret O'Sullivan Kane, Esq., Kane Education Law, LLC, and William A. Sand, Esq., Sand Law, LLC, counsel for Plaintiffs.

Jeanette M. Bazis, Esq., Jenny Gassman-Pines, Esq., and Anna Tobin, Esq., Greene Espel PLLP, counsel for Defendant.

---

## INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Judgment on the Supplemented Administrative Record and Motion to Supplement the Administrative Record. (Doc. Nos. 33, 36.) In the Second Amended Complaint, (Doc. No. 5), Plaintiffs seek reversal or remand of a decision issued by an Administrative Law Judge ("ALJ") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*. For the reasons set forth below, Plaintiffs' Motion to Supplement the Administrative Record is denied, and Plaintiffs' Motion for Judgment on the Supplemented Administrative Record is denied.

# BACKGROUND

## I.      General Background

The Student is an eleven-year-old individual with Down Syndrome.  (D. Ex. 13 at

0054-55.)[1]  The Parent describes her as "a fun, bubbly little girl" and "a social butterfly."

(Tr. at 390-91.)  The Student displays "delays in gross and fine motor coordination,

memory recall and other cognitive functions, developmentally appropriate interpersonal

interactions, and communication skills compared to her same-age peers."  (S. Ex. 23 at

266.)  Her vocabulary is approximately that of a three- or four-year-old.  (Tr. at 640.)

The Student receives special education services "under the Developmental Cognitive

Disability category."  (*Id.* at 0054.)  She began receiving special education in August

2006.  (*Id.*)  The Parent testified that the Student has had numerous friends at the school

for years.  (Tr. at 381-82.)

### A.      The Student's Kindergarten Through Third Grade Years

The Student attended Bertha-Hewit Elementary School in the District from

kindergarten through fourth-grade.  In Kindergarten, a staff person sprayed the Student in

the face with water as a form of behavioral intervention.  (S. Ex. 56 at 425.)  A note in the

Student's medical file relating to this incident indicates that "[the Parent] has considered

pulling her daughter out of the school district . . . but is hoping things will work out to

keep her here in Bertha."  (S. Ex. 68 at 744.)  An "Assistive Technology Consideration"

---

[1]      "D. Ex. ___" refers to the District's exhibits.  "S. Ex. ___" refers to the Student's
exhibits.  "Tr. at ___" refers to the hearing transcript.  The Court refers to the applicable
bates numbers when citing to particular pages within exhibits.

report from 2012, the Student's kindergarten year, indicates that "[the Student] exhibits inappropriate behaviors such as hitting, kicking, spitting and telling an adult to 'shut-up' or 'no.'" (S. Ex. 2.)

Progress Reports from the Student's first- and second-grades show the Student making "Adequate Progress" in multiple goal areas. (S. Ex. 1; S. Ex. 5; S. Ex. 13.) The paraprofessional who worked with the Student during first and second grade testified that she observed the student "swearing, spitting, kicking, [and] hitting." (Tr. at 227.) The Student was not restrained or sent home these years. (*Id.* at 229.) The paraprofessional reported that the Student "mainstreamed for maybe 45 minutes in the morning, [and] the rest of the day was one-on-one." (*Id.* at 236.)

A February 20, 2013 individualized education program ("IEP") amended on November 7, 2013—the Student's first-grade year—notes: "In the mainstream, [the Student] exhibits some undesirable behaviors that can be disruptive and sometimes harmful to her peers and adults. A majority of [the Student's] programming will be done in the Resource Room until [the Student] can learn to function successfully in the mainstream." (S. Ex. 4 at 27.) Similarly, it states that "[s]he has a very short attention span so only lasts so long in the mainstream for large group before she starts making noises or moving around the room. At that point, she comes to the Resource Room for lessons at her pre academic level." (*Id.* at 30.) The IEP notes that "behavior charts" would be utilized to track the Student's progress. (*Id.*) In the description of paraprofessional support needs, this IEP states that "[the Student] shows physical aggression towards self or others." (*Id.* at 31.) The "Least Restrictive Environment

(LRE) Explanation" for this IEP states that "[the Student] will be removed from the mainstream during academic times, where the expectations are too high for her and her growling disrupts her peers and teacher." (*Id.* at 32.) The IEP describes the modifications and supports to be used in response to the Student's disruptive behaviors. (*Id.* at 33.) The Parent testified that the Student was reportedly swearing and touching herself on occasion in first grade. (Tr. at 476.)

The Student's IEP dated February 12, 2014—the Student's second-grade year— reiterates the prior statements regarding the Student's behaviors in the mainstream that she reportedly "can be disruptive and sometimes harmful to her peers and adults." (S. Ex. 11 at 58.) In addition, the IEP states that "[s]he generally can be with her peers without pulling hair, hitting, or kicking. On occasion, those behaviors crop up. [The Student's] most recent behaviors include spitting, growling, and saying 'no' to verbal requests and to her visual schedule." (*Id.* at 61.) Once again, the IEP notes that behavior charts would be kept to monitor progress and identifies a benchmark goal that "[the Student] will make it through her day with two or less 'Needs Improvement' notations on her behavior chart per day for 7 out of 10 days." (*Id.* at 62.) This IEP also contained the language referring to "[the Student] show[ing] physical aggression towards self or others." (*Id.* at 63.) The "Least Restrictive Environment (LRE) Explanation" for this IEP states that "[the Student] will be removed from the mainstream during academic times, where the expectations are too high for her and she disrupts the learning of her peers." (*Id.* at 64.) The modifications referenced in this IEP include

redirection and removal to a different setting "[w]hen [the Student] exhibits undesirable behaviors." (*Id.* at 65.)

Also in the Student's second-grade year, the Eagle Bend Police Department documented a report of suspected child abuse and neglect involving the Student. (S. Ex. 53.) According to this report, a paraprofessional involved with the Student had slapped the Student, tapped her on the mouth, squeezed her head firmly, pulled her around by her ponytail or hood, and "pinned [her] to the wall." (*Id.* at 407-09.) In May 2014, the Todd County Attorney's Office filed a criminal complaint against the paraprofessional for the reported maltreatment of the Student. (S. Ex. 54.)

The Student's third-grade year was successful with limited behavioral difficulties, and the Student was "[m]aking progress." (Tr. at 94, 182-83, 248, 267, 387.) The District's superintendent, Eric Koep ("Koep"), explained that there were "occasional behavior issues, but not to the extreme that started in September [of the Student's fourth-grade year]." (*Id.* at 56-58, 94.) The Student's mainstream teacher, Mark Frethem ("Frethem") similarly testified that the Student did not exhibit significant behavioral difficulties in the mainstream classroom during third grade. (*Id.* at 241-49.) He explained that "when the disruptive behavior began, they left the classroom." (*Id.* at 246.) Frethem testified that he did not witness the Student engaging in behavior that created a danger to herself or others. (*Id.* at 245.) He stated, "I believe she was able to participate somewhat degree [sic] in the classroom to keep her with her classmates a little bit." (*Id.* at 246.) Finally, the Parent agreed that third grade had been "awesome" and that the Student had progressed that year. (*Id.* at 387.) She testified that there were no

similar behavioral challenges as those that later took place in the fourth grade. (*Id.* at 388.)

The Student's February 19, 2015 IEP, agreed upon by the Parent on March 6, 2015—the Student's third-grade year—noted that "[i]n the mainstream, [the Student] exhibits some undesirable behaviors that can be disruptive and sometimes aggressive toward adults." (D. Ex. 5 at 0030.) The IEP explained that "[s]he has shown significantly less negative/aggressive behaviors with peers" and that aggressive behaviors towards staff were less common "in the morning structured setting." (*Id.*) The IEP indicated that the District would utilize "behavior charts" to measure progress on one of the Student's IEP goals. (*Id.* at 0034.) The IEP described the Student's needs for paraprofessional support in the regular education setting, special education setting, and on the school bus. (*Id.* at 0035.) This portion of the IEP noted the Student's "physical aggression towards others," "socially inappropriate behavior," and "unsafe behaviors while on the bus." (*Id.*)

The "Modifications" section of the February 19, 2015 IEP similarly noted that "[the Student] needs observation and redirection of behavior as she shows physical aggression towards others at times and increased vulnerability due to cognitive deficits or socially inappropriate behavior." (*Id.* at 0037.) The IEP provided that "[the Student] will be removed from the classroom to quiet setting [sic] if she is disrupting the learning of her fellow students" and that she would be "removed from the problematic setting to another setting" if "exhibit[ing] undesirable behaviors." (*Id.*) Another modification noted that a paraprofessional would accompany the Student in the school van "to insure

6

that [the Student] stays in her seat and does not harm herself or other students in the van."
(*Id.*)  Amanda Mozis ("Mozis"), the student's special education teacher, explained that
this IEP was intended to be effective from February of the Student's third-grade year
through February of her fourth-grade year.  (Tr. at 545, 548, 603-04.)  The Parent agreed
that "at the start of [the Student's] fourth grade . . . this particular IEP was appropriate for
[the Student]."  (*Id.* at 506.)

### B.    The Student's Fourth-Grade Year

#### 1.    Increasing Behaviors

According to Mozis, the Student began to display increased problematic behaviors
between her third- and fourth-grade years.  (Tr. at 545-48, 550-51.)  Such behaviors
included "running from the designated area," "some physical aggression and a little bit of
the verbal aggression."  (*Id.* at 551.)  Mozis did not have documentation of such
behaviors occurring in the summer. (*Id.* at 578.)  These behaviors reportedly continued in
the Student's fourth grade along with near-daily swearing, hitting, inappropriate touching
of herself, and touching "with a sexual nature."  (*Id.* at 552-53.)  Shari Moller ("Moller"),
the Student's fourth-grade speech teacher at school, testified that she witnessed similar
behaviors such as "[s]wearing, hitting, throwing or destruction of property."  (*Id.* at 636,
638, 702-03.)

Mozis described the Student's fourth-grade year as "rough from the get-go."  (*Id.*
at 554.)  This was consistent with Moller's explanation that "when I started out this year
from the first day there were behaviors."  (*Id.* at 703.)  Mozis explained that "[w]ithin
eight school days or our third week of school we had seen enough behaviors to be

concerned and want to begin charting to see if we could find a pattern with the people or the time of day or the activity to try and get a handle on the behaviors that we were seeing." (*Id.* at 554.)  She met with a team that included the school psychologist to discuss these concerns and developed a chart to document the Student's behaviors.  (*Id.* at 554-57.)  According to Mozis:

> . . . [I]t was a very big concern for us that we were seeing as much swearing and as much physical aggression, that . . . we did not feel it was appropriate.
>
> And I wanted to get a handle on this because it's not allowing her the best education when we've got things that are blocking it and we can't figure out why.

(*Id.* at 556.)  Heidi Bucher ("Bucher"), the District's school psychologist, testified that she talked with Mozis and two other individuals on September 3, 2015 "regarding [the Student's] behaviors and some strategies that we might use to address those." (*Id.* at 711, 716-17.)  She explained that this discussion resulted in the decision to develop a behavior chart and begin tracking the Student's behaviors.  (*Id.* at 717-18.)

## 2.    September 15, 2015 Restraint Incidents

On September 15, 2015, the Student was placed in a restrictive hold in response to a reported emergency situation after she hit a teacher.  (S. Ex. 29; *see also* S. Ex. 56 at 445-46.)  The Critical Incident Data Sheet relating to this incident also reports that the Student "threw objects in the room, swore, [and] kicked the desk." (S. Ex. 29.)  The incident is reported to have taken place from 9:55 to 10:30 in the sensory room.  (*Id.*)  The same day, another restrictive procedure was utilized after the Student reportedly "was throwing objects, swearing, hitting, spitting, [and] kicking." (S. Ex. 30; *see also* S.

Ex. 56 at 445-46.)  This incident took place in the hallway and sensory room from 11:15 to 12:00.  (S. Ex. 30.)

Moller explained the circumstances leading up to the first restrictive hold on September 15, 2015.  (Tr. at 705-07.)  The Student was listening to music on a device, and Moller indicated that her time was finished and speech class was done.  (*Id.* at 705.)  Moller explained, "I signed all done again and she swore and I said stop, hold on.  And she threw the device and started to hit."  (*Id.* at 705-06.)  The Student hit both Moller and the paraprofessional who was with the Student, Mary Denny.  (*Id.* at 706.)  Moller called Merchant and left the room to attempt to let the Student calm down.  (*Id.* at 706-07.)  She was not present when the restraints were imposed on the Student in the classroom.  (*Id.* at 707.)  Merchant testified regarding the restraint:

> I was called down to the sensory room because [the Student] was hitting, spitting, kicking, and throwing things at the two – at the teacher and para who were in the room.  So, I was called down to assist.
>
> And at the time they were unable to calm her and redirect her.  And so, she continued to throw things and hit and kick and spit and was – got to a point of being concerned for [the Student's] safety and getting hurt because there were numerous objects in the room.
>
> And a restraint was put on [the Student] so Mary [Denny] could assist in getting the room cleared out of any other objects and items that [the Student] might hurt herself or others with.

(*Id.* at 318.)

Mozis also testified regarding what took place on September 15, 2015.  (*Id.* at 560-68.)  She was not involved in the first hold or the incidents leading up to it.  (S. Ex. 29 at 341.)  Mozis had been working with the Student when she "became

noncompliant" and "went underneath the table." (Tr. at 560.) Mozis attempted to redirect the Student, and the Student appeared willing to comply with another task. (*Id.* at 560-61.) However, Mozis explained, she then "began . . . clearing and pushing everything off of the table." (*Id.* at 561.) Mozis recalled, "it very quickly went from a compliant situation where she was agreeing with the choices she was given to a situation where she was no longer compliant and was becoming physically aggressive." (*Id.* at 561.) The Student then tried to pick up a large piece of office equipment, and Mozis sought additional staff help because, in her words, "this was going south very fast and being concerned that she was putting herself in physical harm right there, physical danger. That's what led up to being escorted out of the room." (*Id.* at 561.) Merchant then arrived and helped Mozis escort the Student from the room. (*Id.* at 561-62.)

Merchant testified that "when we were leaving the resource room [the Student] indicated to us, and she was very calm and mild about it, that she wanted to walk to the sensory room." (*Id.* at 365.) However, the Student then "became very hostile" and "[they] were concerned about her safety and her running," so she and Mozis then escorted the student down the hall with her hands over her chest in a "CPI hold we were taught." (*Id.* at 325-26, 363-64.) The Student then got onto the floor and a restraint was imposed to hold the Student. (*Id.* at 364.) Mozis explained that she used "[v]ery, very little" force when holding down the Student in the hallway and attempted to verbally calm the Student. (*Id.* at 563-64.)

A video recording documents what took place in the hallway. (S. Ex. 31.) The video shows that Mozis and Merchant escorted the Student in the hallway with her arms

crossed over her chest for a few seconds before the Student dropped to the floor.  (*Id.* at 11:29:06-11:29:13; Tr. at 80-82.)  Mozis and Merchant then held the Student's arms while she was lying on the floor, and Merchant moved to hold down the Student's legs after she appeared to raise her leg or kick.  (S. Ex. 31 at 11:29:13-11:29:33.)  The restraint of the Student's legs lasted approximately two minutes.  (*Id.* at 11:29:33-11:31:20.)  The restraint of the Student's arms lasted approximately three minutes.  (*Id.* at 11:29:13-11:32:01.)  After the staff both stopped restraining the Student, the Student continued to lie on the ground for approximately fifteen minutes before sitting up on her own.  (*Id.* at 11:32:01-11:47:15.)  While the Student was on the floor in the middle of the hallway, numerous students and staff walked past her.  (*See, e.g.*, *id.* at 11:33:10.)  After sitting up, the Student moved over to sit by her paraprofessional, Connie Leyh ("Leyh"), who had arrived on the scene and was standing against the wall.  (*Id.* at 11:48:00; Tr. at 347-50.)  After about three minutes, the Student stood up and walked down the hallway with Leyh, Mozis, and Merchant, reaching out to hold Mozis by the hand.  (S. Ex. 31 at 11:51:05-11:51:19.)

Merchant testified that she believed that the situation was an emergency when the restraint in the hallway was applied.  (Tr. at 333.)  Mozis also believed the restraint incident was an emergency.  (*Id.* at 565.)  As she explained, "moments before what's seen on video was she was grabbing that paper shredder . . . which really scared me.  I mean, I truly thought she was in danger of hurting herself, as it's a very large, heavy machine."  (*Id.* at 564; *see also id.* at 606.)

After the restraint, the Student continued to lie on the floor without being held.

(*Id.* at 336.)  Merchant explained that the staff were "waiting for [the Student] to go on her own accord" because she believed she was not supposed to "pick [students] up and move them." (*Id.* at 338-39.)  She explained that this response was consistent with how she had been trained to deal with such situations:  "You are to let a student on their terms let you know when they are calm and they are ready and they are ready to move on." (*Id.* at 357.)  Mozis explained, "to avoid ramping her up, we were using a technique of ignoring, purposeful ignoring, so that it wasn't giving her more attention to feed into her, but to allow her to unwind in that situation on her own." (*Id.* at 566.)

The school's special education director testified that "[t]he restraint [imposed in the hallway] [was] not one that is taught by CPI." (*Id.* at 250, 271.)  Mozis also testified to this fact.  (*Id.* at 565-66.)  Mozis had not obtained CPI training until October 2015, after the September 15, 2015 incident.  (*Id.* at 546.)  Moller also testified that she was not up-to-date on her CPI training at the time.  (*Id.* at 706.)  This training educates professionals on "nonverbal strategies, the nonviolent crisis intervention strategies and de-escalation, things to do before it comes to a need for a restrictive hold." (*Id.* at 546.)  Mozis followed Merchant's lead, "trusting that [the hold] she was using was CPI certified." (*Id.* at 606.)  Merchant answered affirmatively when asked, "Are you aware that there is collateral damage, not only physically, but psychologically to children when you use a physical restraint?" (*Id.* at 330.)  Mozis testified similarly.  (*Id.* at 586.)

### 3. Aftermath of the September 15, 2015 Incidents

On September 15, 2015, Merchant left a message for the Parent to call her back about the incidents, but the two were unable to connect on the phone until the following

day.  (*Id.* at 383, 385-86.)  The Parent first learned about the incident from other students who reported it to their guardians who then called the Parent that evening.  (*Id.* at 383-85.)  The Parent did not receive an incident report about the incident until "quite a few days" after it took place.  (*Id.* at 392.)  The Parent did not see the video documenting this incident until the day of the parties' resolution session in January 2016.  (*Id.* at 386; S. Ex. 57; S. Ex. 56 at 581-83.)  According to Mozis, she spoke to the Parent "quite immediately after the situation and proposed a team meeting to address the concerns that we were having, as well as the hold that had been done."  (Tr. at 568.)  This meeting, discussed in more detail below, took place on September 24, 2015.  (D. Ex. 7.)

On October 8, 2015, Koep made a maltreat report to the Minnesota Department of Education relating to the September 15, 2015 hold imposed upon the Student in the hallway.  (S. Ex. 55; Tr. at 293.)  According to this report, the hold was not conducted in accordance with guidelines.  (S. Ex. 55 at 423.)  The Minnesota Department of Education's summary description similarly states that "[a] school administrator placed a student in an improper restraint."  (*Id.* at 421.)  There was no reported injury resulting from the hold.  (*Id.* at 423.)  The matter was closed on October 19, 2015 because the incident "[did] not meet the definition of maltreatment."  (*Id.* at 421.)  A case note indicates that "[i]t is a situation of an inappropriately executed physical restraint that did not result in injury."  (*Id.* at 422.)  The District did not notify the Parent of the maltreatment report.  (Tr. at 394-95.)

### 4.  The Student's Behaviors and Regression in Skills

Included in the administrative record are the District's behavioral charts from

September 15, 2015 to February 29, 2016 documenting the Student's incidents of verbal and physical aggression, escape, and inappropriate touching. (D. Ex. 23.) These charts illustrate increased behavioral difficulties during speech, lunch, and recess and in the afternoons. (*Id.*) The charts do not specifically document the antecedent triggers for the Student's behaviors. (*Id.*; *see also* Tr. at 594.) Mozis explained that "[f]rom my college courses and the training that I have there, I know that it's important to try and find the function of the behavior and what is triggering the behavior." (Tr. at 594.) She explained that in her view, such data was "collected and written in the [functional behavioral assessment] that we did." (*Id.*) Mozis testified that the District also did not collect "data around the use of interventions and whether they are effective or not for [the Student]." (*Id.* at 598.)

On October 12, 2015, the District suspended the Student for two days because she "hit and kicked [two] paras[,] threw items off desktop, knocked over waste baskets, [and] tried to tip over water cooler." (S. Ex. 32.) On this day, the District called the Parent to pick up the student from school. (S. Ex. 56 at 429; *see also* D. Ex. 23 at 0204.) The record also includes more than a dozen Incident Report Forms documenting the Student's behaviors throughout her fourth-grade year, such as pulling others' hair; hitting, kicking, and scratching others; inappropriately touching herself and others; spitting; and swearing. (*See* S. Exs. 33-50; *see also* S. Ex. 56 at 505, 510.)

The Student has been seen by Dr. Shaneen Schmidt ("Dr. Schmidt") as her primary care doctor since her birth. (Tr. at 146-49.) During the administrative hearing, Dr. Schmidt agreed that the Student is "vulnerable" and "[has] a communications

disorder." (*Id.* at 169.) She explained that "maladaptive behaviors" among children with communication difficulties are commonly related to stress. (*Id.*)

On February 3, 2016, the Parent brought the Student to Dr. Schmidt for a visit and raised concerns about incidents of wetting at school. (S. Ex. 68 at 778.) The medical note states:

> This only happens when she is at school and never happens when she is at home or on the weekends during the day. When she comes home from school she apparently repeats the word 'naughty' many times. [The Parent] is wondering if she is getting yelled at . . . in a stressful way . . . caus[ing] her to wet her pants.

(*Id.*) Dr. Schmidt described the Student's daytime wetting (or enuresis) to be a "regression in skills." (Tr. at 155-59.) Dr. Schmidt testified that such a response is typically stress-related. (*Id.* at 157.) The Parent similarly testified that daytime wetting was a deterioration in skills as the Student was toilet trained for two years previously. (*Id.* at 434.)

Dr. Schmidt sought to determine the cause of the wetting incidents and "recommended that [the Parent] work with the school for tracking the episodes of enuresis to try to see if we could . . . do a correlation with her enuresis to a particular environmental thing." (*Id.* at 158.) She explained, "I had no idea. I just knew something was happening." (*Id.*) On February 3, 2016, Dr. Schmidt wrote to the District regarding the student's incidents of enuresis:

> [The Student] has been struggling with daytime enuresis during the school year. She has no incidences of any enuresis at home or during the day when she is not in school. I believe that she has some type of trigger or stressor that is bringing on this event. I am requesting that the school keep track of events that occur within 1 hour prior to her daytime enuresis. I

would like to see if we can identify the trigger and potentially modify it so
that she no longer has the enuresis.  I do not believe that she is acting out
but instead is having some type of visceral response to stress.

(S. Ex. 56 at 600.)  Dr. Schmidt did not receive the information she sought from the

District.  (Tr. at 158-59.)  She recommended that "[i]f things can't be identified and

corrected, . . . [the Parent] may need to consider changing schools."  (*Id.* at 159.)  The

Parent explained that the wetting incidents were inconsistently reported in the

communication notebook from the school, and that she never received the data

Dr. Schmidt requested.  (*Id.* at 434-36.)

As of March 2016, the District was reporting the Student's progress as

"Insufficient" on four of her IEP goals.  (D. Ex. 19.)  A note on the Student's Progress

Report dated February 1, 2016 indicates that "[d]ue to behaviors from [the Student], we

are unable to work on these objectives and this goal because she will not do these

activities."  (*Id.* at 0114.)  Another note from March 7, 2016 indicates that "[the Student]

struggles to engage in a variety of settings with appropriate behaviors."  (*Id.* at 0115.)  A

March 2, 2016 grade report indicated the Student was receiving an "A" in Art, Health,

and Music, a "P" in Phy Ed, an "F" in Functional Skills, and an "NI" in Math and

Reading.  (S. Ex. 25.)  No grade was identified for Science.  (*Id.*)  For both Functional

Skills and Reading class, a "disruptive behavior" notation is included.  (*Id.* (capitalization

omitted).)  The Student had also received an "F" in Functional Skills and an "NI" in

Reading during the first and second quarters of fourth-grade.  (S. Ex. 56 at 447.)

### 5.    Student's Presence in the Mainstream Classroom

The Student's schedule in the fall of her fourth-grade year involved alternating

time periods between the general education classroom and the special education environment. (*See* S. Ex. 28 at 327.) For example, the Student was scheduled to be with her peers for breakfast and in the mainstream for a "Morning Meeting." (*Id.*) Her mornings then alternated between speech therapy time with Moller, special education instruction with Mozis, or time in the general education classroom with Jessica Flock ("Ms. Flock"). (*Id.*) The Student was scheduled to have lunch and recess with her peers followed by afternoon instruction largely in the mainstream with the exception of "Down Time" of forty-five minutes with Mozis. (*Id.*)

On September 30, 2015, the Student's mainstream teacher, Flock, e-mailed her special education teacher, Mozis, to inquire about how to best record the Student's attendance because she had been relying on other students to report whether or not they had seen the Student at school. (S. Ex. 56 at 545.) Similarly, Flock also e-mailed Mozis on October 1, 2015 to inquire if the Student was absent from school. (*Id.* at 550.) She noted, "I'm thinking I need to make a more concrete system for identifying [the Student's] attendance." (*Id.*) Again on October 22, 2015, Flock e-mailed Mozis to ask about attendance. (*Id.* at 557.) Flock testified that this occurred "a handful [of days] every month" but that she did not have a specific record identifying the Student's time in her classroom. (Tr. at 221.) She stated: "[w]e have a schedule that they follow the best they can, but we make adjustments throughout the day. So, no, there's no record of her specific times each day in my room." (*Id.*) She testified that she had observed some behaviors by the Student in her classroom, including "inappropriately touch[ing] herself" and refusal to comply with transitions between activities. (*Id.* at 222.) However, she

reported that it was "nothing serious." (*Id.*)

Mozis explained that the Student had some behavior difficulties in the mainstream setting in fourth-grade, but that "it [was] much more frequent in my room because oftentimes she was removed if she was swearing or hitting or kicking or spitting." (*Id.* at 605.) She explained, "[t]he behaviors that we were seeing, she was oftentimes removed from the general ed curriculum and brought out of there so that it's not a scene . . . for the others to have to witness this and that she didn't have to be going through those behaviors in front of her peers." (*Id.*)

The Parent disagreed with the District's characterization that the Student was having problems in the mainstream setting. (*Id.* at 522.) She acknowledged that some removals were appropriate "to try to address [the Student's] individual academic, behavioral, and functional needs." (*Id.* at 521.) The District did not provide the Parent with data on the frequency of removals from the mainstream classroom, and Mozis testified that she did not record such removals. (*Id.* at 400-01, 608.)

### 6. Calls to the Parent and Removals from School

The Parent testified that she received numerous calls from the District throughout the Student's fourth-grade year beginning in September. (*Id.* at 401.) She asserted that these calls were taking place "[d]aily" and related to the Student's behaviors. (*Id.* at 405-06.) According to the Parent, "[m]any times I'd have to come get her." (*Id.* at 406.) The Parent explained that in the first part of the Student's fourth-grade year, she left work "[w]eekly, on a weekly basis, a couple times a week" to get the Student from school. (*Id.*) If the Parent were unavailable, the District would call others including the Parent's

son and a friend of the Parent.  (*Id.* at 406-07.)  The Parent testified that her friend was called "a couple, two, three times a week, daily."  (*Id.* at 407.)  The Parent explained that she requested the District to stop these calls and that the calls stopped for some time before starting again.  (*Id.* at 407-08.)  The Parent testified that she stopped receiving calls "[a]bout a month" before the administrative hearing.  (*Id.* at 408.)  The Student's half-brother testified that he was called by the District on "probably five" occasions to pick up the Student, and that he actually did so one time.  (*Id.* at 304.)  The Student's personal care assistant testified that she "[was] aware that [the Student] was . . . being sent home on a consistent basis."  (*Id.* at 486-87, 503.)

As previously noted, the District suspended the Student for two days in October 2015.  (S. Ex. 32.)  According to the District's behavior charts, the Parent came to the school on November 9, 2015 for approximately forty minutes after the Student was exhibiting behavioral difficulties.  (D. Ex. 23 at 0223.)  Records also indicate that the Parent was called to pick up the Student two times in February 2016 due to behaviors. (S. Exs. 42 & 44.)

## C.    Educational Planning in the Student's Fourth-Grade Year

### 1.    September 24, 2015 IEP Team Meeting

On September 17, 2015, the District issued a Notice of a Team Meeting for a September 24, 2015 IEP Team Meeting "[t]o discuss the need for development and implementation of a Behavior Intervention Plan (BIP)."  (D. Ex. 6.)  The record of this meeting indicates that the Parent attended, but Mozis did not sign the record of attendance, and no general education teacher is identified.  (D. Ex. 7.)  However, Mozis

testified that she prepared the agenda for the meeting, and she testified about the contents of what took place at the meeting. (Tr. at 569-70.) According to Mozis, the team discussed conducting a functional behavioral assessment ("FBA") "to get some answers for what we were seeing" and proposed "an additional 45 minutes to get [the Student] some downtime." (*Id.* at 569-70.)

The Parent testified that those in attendance "discussed downtime in the afternoon" outside of the mainstream setting. (*Id.* at 396-97.) She explained, "at that time I felt in the afternoon, long day maybe – at the time I felt maybe she needed a little break." (*Id.* at 396.) The rest of the team agreed. (*Id.* at 396-97; *see also id.* at 719.) The Parent testified that she later determined this approach was not working as anticipated. (*Id.* at 399.)

According to the Parent, the District did not mention the possibility of conducting an FBA at the September meeting. (*Id.* at 410.) She testified that she proposed the FBA. (*Id.* at 455, 734.) Bucher, the school psychologist, testified that she attended the meeting and explained that "[m]y involvement was to be there to explain the possibility of a functional behavior assessment and what that might entail or might look like." (*Id.* at 718.) She explained the Parent's response to the FBA suggestion as follows: "I recall that we explained the process quite thoroughly, as she did have some questions about it, but in the end she was in agreement that that was an acceptable plan." (*Id.* at 719.)

## 2. September 28, 2015 IEP Amendment

On September 28, 2015, the District issued a Prior Written Notice proposing an increase in the Student's special education services. (D. Ex. 8A at 0042.) Specifically,

20

the notice lists the following reason for the proposed change: "[the Student] is exhibiting significant behavioral difficulties at this time, so the IEP Team has determined that increased behavioral support services are needed." (*Id.*) The Parent and the District entered into an Agreement to Amend dated September 28, 2015, and the Student's February 19, 2015 IEP was amended "without convening the entire IEP Team." (D. Ex. 8A.) This agreement states, "At the meeting on 09/24/2015, the team members decided that [the Student] would increase her service time away from her peers by allowing for downtime in her afternoons in the Resource Room." (*Id.*) The resulting IEP increased the Student's time in the special education setting by 45 minutes, and included the same goals and modifications as the February 19, 2015 IEP. (*Id.*) The Parent agreed that "at least . . . as of September 24th of 2015 . . . that IEP [was] appropriate to address [the Student's] educational needs." (Tr. at 507.)

### 3. The District's Functional Behavior Assessment

The District issued a Prior Written Notice on October 7, 2015 proposing to conduct a behavioral assessment of the Student. (D. Ex. 10.) This notice indicates that "[t]he Team determined that additional behavioral and functional data is needed to determine appropriate programming for [the Student] and meet her educational needs." (D. Ex. 10 at 0049.) Rather than utilize "existing information," the Team decided to obtain new data "to determine an appropriate behavioral plan and schedule for [the Student]." (*Id.*) On October 9, 2015, the Parent agreed to this evaluation. (*Id.* at 0048.)

An Evaluation Report dated November 23, 2015 documents the results of the District's behavioral assessment. (D. Ex. 13.) This report illustrated the District and the

Parent's reports regarding the Student's behaviors at home and school.  (*See generally id.*)

The Parent reported receiving "daily phone calls from the school" and stated the

"everything in the communication book is negative."  (*Id.* at 0055.)  The Parent also

indicated that the Student has no "major behavioral problems at home."  (*Id.* at 0054.)

This was consistent with testimony of the Student's personal care assistant who reported

not seeing dangerous, violent, or sexual behaviors while working with the Student.  (Tr. at

487-89, 493.)

The Evaluation Report notes the following regarding the Parent's view of the

transition between third- and fourth-grade:  "Mom shared that [the Student] had a really

good year last year and this year since the first week of school things have been difficult.

Mom's big question is 'What's Different'?"  (D. Ex. 13 at 0055.)  The Parent sought "a

positive intervention plan" and indicated that "[s]he wants to move forward with good

positive interventions."  (*Id.*)

In the "Academic" section of the report, the following information was reported

relating to the Student's academic performance in mainstream class:  "[The Student] often

exhibits undesirable behaviors that are disruptive and harmful to herself, peers, and

adults."  (*Id.* at 0057.)  In particular, the Student's fourth-grade teacher, Flock, reported

behaviors such as "swearing and inappropriate touching of herself while in the

classroom."  (*Id.* at 0058.)  She also indicated that the Student was frequently absent from

the mainstream classroom as a result of her behavior.  (*Id.*)  This section of the report also

notes, however, that "[the Student], at times, is able to follow the classroom routine and

her modified schedule with the help of a paraprofessional."  (*Id.* at 0057.)

The District completed a "Functional Behavior Assessment," the results of which were reported in the November 23, 2015 Evaluation Report.  (*Id.* at 0060-68.)  Bucher completed the FBA on behalf of the District, and she explained that in doing so, "I'm seeking information on the student's behaviors, specifics about what might trigger those behaviors, what we hypothesize that the function of those behaviors are."  (Tr. at 720.)  She explained that she relied on the District's behavior charts in developing the FBA.  (*Id.* at 721.)  Data was gathered through "Parent & Teacher Interviews, Teacher Checklists, Direct Observation, Review of Educational Records, [and] Review of Data Collection by School Staff."  (D. Ex. 13 at 0060.)  Specifically, behavioral data was collected on twenty-eight days between September and November 2015.  (*Id.* at 0061.)  The FBA included a "Description of Problem Behaviors" as follows:

- [The Student] demonstrates verbal aggression (swears, grumbles, makes loud noises, screams) typically several times per day
- [The Student] displays physical aggression (hits, kicks, throws objects, spits, grabs clothing) several times per week
- [The Student] touches herself inappropriately (hands in pants, taking clothes off) several times per week
- [The Student] demonstrates unwanted touching of peers/staff (sitting on lap, hugging, touching others' private areas) approximately one time per week
- [The Student] displays non-compliance in the form of refusal of directions/tasks presented to her several times per week
- [The Student] escapes/leaves designated area occasionally (approximately one time per week).

(*Id.* at 0060-61.)  The FBA notes that these behaviors "are observed primarily in the school setting" and reiterates the Parent's report of "minimal behaviors in the home setting."  (*Id.* at 0061.)  In addition, the FBA notes that behaviors tended to be more

problematic during particular parts of the school day such as the Student's "daily speech/language sessions" or during lunch and recess. (*Id.*) The FBA identified multiple "Positive Behavioral Interventions and Supports" that had been attempted as well as an indication of which supports had proven effective. (*Id.* at 0060.) The FBA also identified a number of "Changes in the Environment to Lessen Problematic Behavior." (*Id.*) Narratives in the FBA described three observations of problematic behaviors in the "Break Room," "Indoor Recess," and "Resource Room." (*Id.* at 0062-63.) Bucher testified that she did not make observations of the Student in the general education setting to complete her FBA. (Tr. at 730-31.)

The November 23, 2015 Evaluation Report concluded with an identification of the Student's educational needs as well as a number of "[a]daptations/modifications (needed to allow the student access to the general education curriculum)" such as a "Behavior Intervention Plan (including positive behavior supports)," breaks for movement, preferred seating arrangements, and "[a] reinforcement system . . . to provide [the Student] with positive reinforcement for displaying appropriate behaviors." (D. Ex. 13 at 0068.) The Parent testified that she agreed with these recommendations. (Tr. at 508.) Bucher explained that such interventions were reportedly being utilized by the District and that "many of these interventions that were in place are research-based and supported in the literature." (*Id.* at 722-23.)

### 4. The Parent's Independent Functional Behavioral Assessment

In October 2015, Plaintiffs decided to hire an independent evaluator to complete a functional behavioral assessment. (D. Ex. 29 at 0494.) On November 2, 2015, Plaintiffs

notified the District that they had hired Nic Collette ("Collette") from Opportunity Matters "to conduct an independent functional behavioral assessment on [the Student's] behalf." (*Id.* at 0504.) Collette works as a behavior specialist at Opportunity Matters to provide consultation and advice regarding individuals with behavior challenges. (Tr. at 644-45.) He became involved with the Student's situation "[t]o try to find solutions for providing supports within the school setting." (*Id.* at 646.)

Collette issued an FBA dated November 30, 2015 summarizing his observations and recommendations regarding the Student's behaviors. (S. Ex. 23 at 265-82.) Collette's FBA was developed based on a review of records, interviews with the Parent and individuals from the District, observations of the Student on November 10, 11, 18, and 19, 2015, and behavioral data collected by the District between September 5, 2015 and November 5, 2015. (*Id.* at 265.) Collette indicated that those interviewed described the Student's difficult behaviors "as having significantly increased since the start of [the Student's fourth-grade] year (Fall 2015)." (*Id.* at 269.) His report noted that "[n]o major changes in [the Student's] life were reported to have occurred during the Summer of 2015." (*Id.*)

Collette's report identified a number of patterns in the Student's behaviors. For example, the Student was noted to have less difficult behaviors around a particular paraprofessional who had worked with the Student for multiple years. (*Id.* at 269.) In contrast, Collette noted "[the Student] will struggle with new or unfamiliar paraprofessionals." (*Id.*) In addition, the student's behaviors were reported to increase in frequency later in the week as well as "during Speech, Recess, and generally throughout

the afternoon." (*Id.* at 276-77.) Despite these patterns, Collette stated "[the Student's] challenging behaviors vary considerably from day to day within the school setting." (*Id.* at 276.) When asked whether he observed the Student "putting herself or others in danger," Collette testified that he had not. (Tr. at 678.) He also testified that he did not observe "what appeared to be purposeful sexual touching of others." (Tr. at 695.)

Collette identified a number of reported and observed strategies used by District staff to respond to the Student's behaviors such as "brief time-outs or other forms of redirection to different activities or removal from the setting where challenging behaviors occur, planned ignoring, and the use of edible rewards and verbal praise for cooperation." (*Id.* at 270.) "Antecedent strategies" described in the Student's IEP were reported to have a short-term impact on behaviors but a limited lasting impact. (*Id.* at 270.) Notwithstanding the implementation of such strategies, Collette noted, "informants suggest that the duration and severity of [challenging] behaviors, as well as how quickly [the Student] escalates from less to more severe behaviors have actually appeared to increase." (*Id.*) Collette's FBA stated, "[o]f note in speaking with the school informants were fairly consistent reported apprehensions regarding any use of 'hands-on' interventions with [the Student] and how to respond when challenging behaviors arise." (*Id.*) The one paraprofessional identified as having success interacting most effectively with the student suggested that her success may be attributed to "the fact that she is confident enough in working with [the Student] to avoid showing fear or apprehension, which others may at times appear to do." (*Id.*) Collette noted a consistent response among informants that "[the Student's] relatively recent experience of physical abuse and

neglect within the school may have had lasting effects on her behavior, particularly as a result of current employees working with her feeling somewhat hesitant or unconfident in how best to respond to incidents of challenging behavior." (*Id.* at 277.)

Collette's FBA made a number of specific recommendations suggesting how the District staff could best respond to the Student's behaviors, including "Differential Reinforcement of Alternate Behavior," "Shaping and Chaining," and "Antecedent Interventions." (*Id.* at 278-80.) Collette also recommended specific training for staff as well as collection of additional behavioral data going forward. (*Id.* at 280.)

### 5.    December 2, 2015 IEP Team Meeting

On November 12, 2015, the District scheduled an IEP Team Meeting for November 19, 2015 "[t]o discuss evaluation results and need for development and implementation of a Behavior Intervention Plan (BIP)."[2] (D. Ex. 12.) On November 17, 2015, Plaintiffs, through counsel, requested that this meeting be rescheduled because the Parent had not yet received the District's evaluation to review in advance of the meeting. (D. Ex. 29 at 0552.) In this e-mail, counsel asserted that "[n]o child can be well served when critically important documents are not provided to the parent and the child's attorney for review in advance of the meeting." (*Id.*) The same day, the District replied through counsel, agreeing to reschedule the meeting, and noting that "[t]he District has attempted to schedule the meeting to discuss the FBA and revisions to [the Student's] IEP/Behavior Plan in order to be responsive to [the Student's] needs." (*Id.* at 0551.) In

---

[2]    This meeting was initially scheduled for November 18, 2015. (D. Ex. 11.)

this e-mail, counsel for the District also suggested that "the provision of the written FBA in advance of the meeting is not a requirement of state or federal law." (*Id.*)

On November 20, 2015, counsel for the District sent Plaintiffs a draft copy of the District's Evaluation Report including results of the FBA. (*Id.* at 0574-95.) In this e-mail, counsel noted that the District had not rescheduled the IEP team meeting because the Parent had expressed a desire to review the FBA first. (*Id.* at 0574.) Counsel also stated, "[n]evertheless, it is important that a meeting be convened as soon as possible to discuss the FBA and most importantly that the team discuss [the Student's] placement and the need for additional interventions." (*Id.*) The District thus requested that a meeting be scheduled between November 30, 2015 and December 4, 2015. (*Id.*)

On November 30, 2015, the District scheduled an IEP Team Meeting for December 2, 2015. (D. Ex. 14.) The topic of the meeting was once again "[t]o discuss evaluation results and need for development and implementation of a Behavior Intervention Plan (BIP)." (*Id.*) The meeting agenda indicates that its purpose was to "[g]ather additional behavioral and functional information to determine appropriate programming." (D. Ex. 15.) "Behavior Intervention Plan" ("BIP") is also identified as an agenda topic. (*Id.*) On November 30, 2015, the District e-mailed the Parent and offered to pay for Collette to attend the IEP team meeting. (D. Ex. 29 at 0597.) Plaintiffs, however, wished to "keep the independent FBA separate from [the District's] actions." (*Id.* at 0601.)

In a December 1, 2015 letter, Plaintiffs' counsel identified the Plaintiffs' concerns leading up to the December 2, 2015 IEP Team Meeting:

As we have previously expressed, [the Parent] and I are very concerned about the regression that [the Student] has suffered since the beginning of this school year. Throughout each meeting, [the Parent] has asked the members of the team to identify what they believe is so different this school year from last school year. During the 2014/15 school year, [the Student] had little to none of the behaviors identified in your client's FBA and spent a majority of her school day in the third grade classroom. . . .

Both [the Parent] and I must persist in our request to identify what has changed for [the Student]. . . . Instead of a response and a candid discussion about what changed for [the Student], the team members focus on addressing the symptoms rather than the underlying cause.

(*Id.* at 0601-02.)

The record of the December 2, 2015 IEP Team Meeting indicates that the Parent, Parent's counsel, counsel for the District, Mozis, and Flock were in attendance, along with a number of other representatives. (D. Ex. 16; *see also* D. Ex. 25.) Collette did not attend the December 2, 2015 IEP Team Meeting. (Tr. at 140.) The record is unclear whether the Parent had a copy of Collette's FBA by the time of this meeting; Collette testified that he thought he sent it to the Parent "around December 2nd or 4th" while the Parent testified that she received it on December 15, 2015. (*See* Tr. at 701, 734.) The Parent testified that the District was not proposing "a more restrictive setting for [the Student]" at this meeting. (Tr. at 415.)

Following the December 2, 2015 IEP Team Meeting, Plaintiff's counsel sent a letter to counsel for the District on December 3, 2015 identifying a number of concerns resulting from the meeting. (D. Ex. 29 at 0603-04.) Counsel noted that "someone within [the District] instructed the educators to take a literal 'hands off' approach to [the Student]" and suggested that "[i]t is evident that this policy has contributed to [the

Student's] behavioral regression." (*Id.* at 0603.) Counsel also stated that "it is of concern that [the District] is seeking to include a time out room, i.e., calming room, for [the Student] in her IEP when no such room has been previously needed." (*Id.*) In addition, counsel raised concerns over apparent changes to the Student's education made in the absence of the Parent's input. (*Id.*) Counsel indicated, "[w]e attempted to understand what changes took place of late that has resulted in [the Student] doing so well that the educators went from calling [the Parent] multiple times per day to zero calls shortly before the Thanksgiving holiday." (*Id.* at 603-04.) Regarding the Parent's request for educational data, counsel stated:

> Despite my request to be provided with all the relevant data in advance of the meeting, your client came to the meeting to discuss data related to [the Student's] behavior. That data was not provided to me or [the Parent]. This oversight is unacceptable to [the Parent] and prejudices her ability to advocate for [the Student] and participate in the development of education programming.

(*Id.* at 604.) Counsel also referenced "[t]he parties['] discuss[ion of] having a third party come into the school to work with [the Student] and the educators to assist with developing interventions." (*Id.*) She suggested a particular organization for the District to use for this purpose. (*Id.*)

In a letter dated December 7, 2015, the District's counsel responded to a number of the concerns identified in Plaintiffs' counsel's December 3, 2015 letter. (*Id.* at 0607.) Counsel for the District disputed Plaintiffs' suggestion that the Parent was opposed to a "hands-off" policy regarding the Student. (*Id.*) He explained, "[c]ontrary to the allegations in your letter, several members of [the District's] educational team did

understand [the Student's] mother to have requested a 'hands-off' approach in interventions with her daughter. In any event, the team will address this issue in the behavior plan." (*Id.*) The District's counsel also indicated that the District would continue to pursue the possibility of using a "calming room" for the Student. (*Id.*) He stated, "[r]egardless of any current trajectory of [the Student's] behaviors, [the Student] possesses a significant impairment where significant aggressive or inappropriate behaviors can be anticipated. As a result, the District will propose that this intervention be included in the behavior plan/IEP." (*Id.*) Enclosed with this letter were "data sheets" discussed during the IEP Team Meeting, specifically daily behavior logs for the Student from September 15, 2015 to November 2, 2015.[3] (*Id.* at 0607-45.) The Parent testified that she never requested "a hands-off approach" with the Student. (Tr. at 416-17.)

### 6.     December 2015 and January 2016 Proposed IEPs

On December 30, 2015, Plaintiffs' counsel contacted counsel for the District to obtain the District's proposed BIP. (*Id.* at 0647.) According to counsel's letter, this was a repeat of a previous request made on December 18, 2015. (*Id.*; *see also* S. Ex. 56 at 591 (December 18, 2015 Letter).) On December 30, 2015, counsel for the District e-mailed Plaintiffs' counsel a copy of the proposed IEP and BIP, stating "[t]he District had send [sic] the attached document to me earlier and I neglected to forward it to you. Anyway,

---

[3]     Two pages within this exhibit appear to be e-mails between the District and counsel for the District. (*See* D. Ex. 29 at 0638-39.)

attached is the propose [sic] IEP/behavior plan following our meeting earlier this month." (D. Ex. 29 at 0648.)  The attached IEP was dated December 2, 2015.[4]  (*Id.* at 0648-67.)

The Prior Written Notice attached to the December 2, 2015 proposed IEP states: "The district is proposing to make the following changes to [the Student's] IEP:  increase [the Student's] service minutes, implement a Positive Behavior Support Plan, implement additional modifications and accommodations – including positive and proactive behavioral strategies, add a goal relating to behavioral skills."  (*Id.* at 0650.)  The District made the proposed changes based on the following:  "A recent re-evaluation was completed, including [an FBA], due to [the Student's] exhibiting significant behavioral difficulties.  Based on the results of the re-evaluation, including the FBA, the team has determined it appropriate to increase behavioral support services."  (*Id.*)  The notice also states that "[t]he IEP Team considered increasing time in the general education classroom, however due to significant behavioral difficulties, [the Student] is not always successful in this environment.  The team determined behavior is a priority at this time."  (*Id.*)

Goals 1 through 6 of the December 2, 2015 IEP are substantially identical to these goals as outlined in the most recent September 29, 2015 IEP agreed upon by the parties. (*Compare* D. Ex. 29 at 0654-60 *with* D. Ex. 8A.)  The December 2, 2015 IEP, however, includes a new Goal 7 relating to behaviors.  (D. Ex. 29 at 0661.)  The description of the

---

[4]     The ALJ relied on this copy of the December 2, 2015 IEP as it was the version clearly sent to Plaintiffs.  The Court will do the same.  The record reflects that this version of the proposed IEP was received by Plaintiffs' counsel on December 30, 2015. Counsel for the District inadvertently failed to transmit the proposed IEP to Plaintiffs' counsel upon receipt from the District on December 18, 2015.  (*See* D. Ex. 29 at 0670-71.)

Student's level of performance under this goal states: "[The Student] displays non-compliance in the form of refusal of directions/tasks presented to her several times per week. When she is expected to transition to a non-preferred adult, she often becomes verbally or physically aggressive." (*Id.*) It also notes that the Student "swears, grumbles, makes loud noises, [and] screams" multiple times daily. (*Id.*) Goal 7 provides that "[the Student] will increase positive response to directions/tasks, from refusing and displaying aggression, to promptly following directions through use of direct instruction and role modeling." (*Id.*) The District proposed increasing service minutes in the Special Education environment by 30 minutes and allocated 75 minutes per day to "Developmental Cognitive Disorder: Behavior Skills." (*Compare* D. Ex. 29 at 0662 *with* D. Ex. 8A.)

In the portion of the IEP describing the Student's paraprofessional support services, the IEP states that "[the Student] has displayed significant behavioral difficulties to include verbal and physical aggression, destruction of property, and threat of harm to self and others." (D. Ex. 29 at 0662-63.) The IEP notes that the Student's paraprofessional would "assist and redirect behavior through implementation of Positive Behavior Support Plan." (*Id.*) The December 2, 2015 IEP's "Least Restrictive Environment (LRE) Explanation" is largely the same as the explanation included in the Student's previous IEP with the addition of "behavioral skills" included in the description of the Student's special education services. (*Id.* at 0663; *see also* D. Ex. 8A.) In the "Program Modifications, Supports and Adaptations in General and Special Education" section, a number of new items are identified alongside existing strategies. (*Id.* at 0664; *see also* D. Ex. 8A.) Three

strategies for staff training are identified, including that "[c]lassroom instructors and paraprofessionals will be provided training and assistance in implementing the Positive Behavior Support Plan." (*Id.* at 0664.)

The "Positive Behavior Support Plan" attached to the December 2, 2015 proposed IEP (hereinafter, "BIP") identifies strategies, skills, and interventions intended to respond to the Student's behaviors. (*Id.* at 0665-67.) For example, strategies include "[r]egularly scheduled 'brain breaks' with peers," "[r]edirect[ing] [the Student] to avoid escalation in behavior," and "[m]odified schedule to include 'down time' in the afternoon before PE and general education time." (*Id.* at 0665.) An example of a skill includes the Student employing "a calming routine to use when she begins to feel agitated." (*Id.* at 0666.) The BIP also includes measures for responding to the Student's physical behaviors and a "Crisis Intervention Plan" which provides that "Restrictive Procedures will only be used in response to a behavior that constitutes an emergency." (*Id.* at 0667.)

The BIP notes that it was developed because "[the Student] has demonstrated significant behavioral difficulties in the general and special education settings, including verbal aggression (swearing, grumbling, making loud noises, screaming), physical aggression (hitting, kicking, throwing objects, spitting, grabbing clothes) and noncompliance (refusing directions/tasks, escaping area)." (*Id.* at 0665.) It also notes that the Parent indicated that behavioral issues were minimal at home. (*Id.*)

When questioned about the proposed strategies in the BIP, the Parent testified that "I don't recall not agreeing to any of these strategies to be used with [the Student]." (Tr. at 511-12.) She testified that it was her understanding that the BIP "was being

implemented." (*Id.* at 512-13.) She explained, "[t]hey were trying some of those things when [the Student] was having bad days." (*Id.* at 531.) However, the Parent testified that she had not obtained information about whether any interventions were successful. (*Id.* at 531.) She later testified that she was not informed "that the BIP was being implemented" by the District. (*Id.* at 735.)

On January 6, 2016, Plaintiffs' counsel sent a letter to counsel for the District objecting to the proposed IEP and raising specific concerns. (D. Ex. 29 at 0672-73.) First, counsel raised a concern about the inclusion of a "Developmental Cognitive Disorder: Behavioral Skills" category among the Student's special education services because this new service had not been discussed by the parties. (*Id.* at 0672.) Along with this concern, counsel noted that "[the Parent] and I are unable to identify any data or information reflecting the interventions that have been used with [the Student] and the success of those interventions." (*Id.*) Second, counsel identified the Parent's opposition to language in the IEP referring to the Student as "a threat of harm to self and others." (*Id.*) Third, counsel raised the Parent's concern over the IEP's reference to "removal of [the Student] from the mainstream classroom at regular intervals." (*Id.* at 0673.) In particular, counsel took issue with the fact that Plaintiffs had not seen documentation of the frequency of removals or use of positive behavioral strategies. (*Id.*) Counsel also referenced the Plaintiffs' proposal that the District engage Collette to train the District's staff and that the Student's personal care attendant assist the Student at school until staff was fully trained. (*Id.*) As an enclosure to this letter, Plaintiffs provided the District with a copy of Collette's independent FBA. (*Id.* at 0673-91.)

On January 13, 2016, counsel for the District responded to the concerns raised in Plaintiffs' January 6, 2016 letter. (*Id.* at 0692-93.) The District intended to maintain special education services in the Behavioral Skills category, agreed to "propose alternative language that still describes [the Student's] behaviors" in lieu of the language to which Plaintiffs were opposed, and noted that the District was not clear about Plaintiffs' particular issue with the level of mainstream versus special education classroom time being proposed, but indicating that "[t]he District does not believe that it would be appropriate to propose a lesser amount of direct special education services." (*Id.*)

On January 20, 2016, counsel for the District sent a new proposed IEP to Plaintiffs. (*Id.* at 0694-708.) This version reduced the quantity of special education services relating to "Developmental Cognitive Disorder: Behavior Skills" from 75 minutes to 30 minutes and designated 45 minutes as simply "Developmental Cognitive Disorder." (*Compare id.* at 0662 *with id.* at 0706.) In addition, the language referring to the Student as posing a "threat of harm to self and others" was removed from the description of paraprofessional services. (*Compare id.* at 0662-63 *with id.* at 0706.) The "Accommodations, Modifications and Supports" section was unchanged. (*Compare id.* at 0664 *with id.* at 0708 (capitalization omitted).) The Parent never responded to this IEP proposal. (Tr. at 630.)

### D.     The Parent's Requests for Information

Throughout the Student's fourth-grade year, the Parent made a number of requests for information to the District. On October 8, 2015, Plaintiffs' counsel wrote to counsel for the District asserting that the District had breached a previous settlement agreement

entered into by the parties relating to staff training.  (S. Ex. 59.)  In this letter, Plaintiffs'

counsel identified the Plaintiffs' concerns regarding the Student's apparent deterioration

at school:

> . . . [M]y client and I were struggling to understand why, suddenly, [the
> Student] is exhibiting deteriorating behavior at school.  [The Student] did
> so well last year.  Certainly, no restrictive procedures were used.  The
> question becomes what has changed between last school year and this
> school year to contribute to her regression in behavioral skills.  Within the
> first month of her attendance this year, she had been physically restrained
> *twice* in one day.  The impact of that type of intervention is far reaching on
> the child, the parent and the relationship between the team members. . . .
>
> . . . [M]y client and I cannot sit idly by while another school year is lost for
> [the Student].

(*Id.* at 609-10.)

Again on October 15, 2015, Plaintiffs' counsel wrote counsel for the District

seeking "more details related to the antecedents to the behavior and what positive

behavior interventions were used to avoid the crisis."  (D. Ex. 29 at 0491.)  Plaintiffs'

counsel indicated that a request for such information had already been made but that it

was not yet provided.  (*Id.*)  The letter stated, "My client cannot begin to understand what

is happening with [the Student] this school year without that information."  (*Id.*)

An October 26, 2015 letter from the District's counsel to Plaintiffs' counsel

acknowledged Parent's continuing requests for more information about the

September 15, 2015 restraint incidents and the Student's behavioral changes.  (*Id.* at

0493.)  The letter states:

> The school team acknowledges the importance of understanding what has
> precipitated the recent increase in [the Student's] behaviors.  For this
> reason, it proposed and has nearly completed a functional behavioral

assessment (FBA).  In addition, the District remains open to the prospect of completing an FBA at District expense, should there be parental disagreement with the District's evaluation once it is completed.

The District hopes that through a deliberate and objective evaluation process, it can obtain additional answers with how to appropriately respond to [the Student's] behavioral needs.  Once the evaluation process is completed, an IEP meeting will be scheduled to develop an appropriate behavior plan and to address any additional questions.

(*Id.*)

In a November 4, 2015 e-mail to counsel for the District, Plaintiffs' counsel noted that "[w]e are still waiting for an answer tour [sic] data request related to the restraints that were used with [the Student]."  (*Id.* at 505.)  This request was repeated in a November 11, 2015 e-mail in which Plaintiffs' counsel summarized Plaintiffs' concerns as follows:

The whole situation – multiple telephone calls from staff each day, multiple requests to [the Parent] to come and pick up [the Student] nearly daily, no information on how [the Student] is functioning or changes in staff, etc. are more disruptive to [the Student's] education.  With each day that passes, harm to [the Student] accrues.

(*Id.* at 0526.)  On November 11, 2015, counsel for the District notified Plaintiffs' counsel "that information has been sent home" relating to Plaintiffs' requests for data.  (*Id.* at 0525.)  The e-mail notes that a video of the restraint incident had "not been provided" because it "contain[ed] images and private data on other individuals" that had not been redacted.  (*Id.*)

In a November 12, 2015 e-mail, Plaintiffs' counsel summarized the Plaintiffs' repeated requests for data relating to the Student's education and behaviors:

[The Parent] and I repeatedly asked through electronic correspondence to meet with your client to discuss [the Student's] behavior.  We asked for the data related to her behaviors.  No timely response was received.  The

> parties met in an IEP team meeting earlier wherein we expressed our
> concerns for her regression in skills and renewed our request for her
> education data.
>
> As [the Student's] behavior deteriorated, we continued to ask for a meeting
> and the data related to her interventions. No timely response was received.

(*Id.* at 0536.) Later that same day, counsel for the District wrote that "I do know that the

District has provided certain educational data to your client in response to prior data

requests made by your office. I am unsure what additional information you/she is seeking

but we would be happy to provide the same." (*Id.* at 0542.)

In a November 17, 2015 e-mail, counsel for Plaintiffs made another request for

educational data, noting that "[a]s for the data, we have requested, we have still not been

provided with the requested video." (*Id.* at 0551.) The District's counsel once again

replied by explaining that the video contained "comingled private data" and stating that

"[t]he District can research the feasibility and cost of redaction at your request." (*Id.* at

0550.) On November 18, 2015, Plaintiffs' counsel asked the District to "provide us with

the costs and produce the video" and suggested that Plaintiffs should have access to the

video prior to an IEP team meeting, indicating that "[w]hat took place is essential to our

understanding of [the Student's] challenges at school." (*Id.* at 0563.)

On December 7, 2015, Plaintiffs' counsel e-mailed the District's counsel to once

again request data relating to the Student's behaviors as well as the video. (*Id.* at 0605.)

Counsel for the District responded via e-mail the same day indicating that he intended to

mail to Plaintiffs the "raw data (referenced at the meeting) relied on in the FBA" and

offering to permit the Parent or Plaintiffs' counsel to view the video. (*Id.*) The e-mail

noted that an unredacted copy of the video would not be provided. (*Id.*) The Parent

received the raw data (the District's behavior charts) as an enclosure to a

December 7, 2015 letter from counsel for the District. (*Id.* at 0607-45.)

In the January 6, 2016 letter from Plaintiffs' counsel responding to the District's

proposed IEP, counsel notes that:

> [T]he IEP discusses removal of [the Student] from the mainstream
> classroom at regular intervals. [The Parent] and I have not seen any
> information related to how often and frequently [the Student] has been or is
> being removed from the mainstream and for what purposes. There is also
> no information or data regarding the use of positive interventions.

(*Id.* at 0673.)

The Parent testified that she was "asking for information about what was

happening with [the Student]" on a "[d]aily" basis. (Tr. at 419.) She explained, "I

wanted – I asked – I wanted to know what was happening, what was happening before,

during, after, how long it was happening and what times of the day, during what classes."

(*Id.* at 420.) She reported not seeing the District's behavioral data until the parties were

in litigation. (*Id.* at 419-21.) According to the Parent, she did not know the District was

collecting the data. (*Id.* at 421.)

### E.    Request for Administrative Hearing and Resolution Session

On January 21, 2016, Plaintiffs' counsel e-mailed counsel for the District, stating

that "[the Parent] and I have offered multiple solutions to your client in writing. Thus far,

your client has not responded to those proposals." (D. Ex. 29 at 0712.) Plaintiffs' counsel

indicated that Plaintiffs intended to pursue an administrative hearing and would file a

complaint within a few days. (*Id.*) The same day, Plaintiffs sent a Request for

Administrative Hearing to the Minnesota Department of Education.  (*Id.* at 0713-16.)

On January 29, 2016, the parties participated in a resolution session.  (S. Ex. 56 at 581-83; S. Ex. 57.)  At this meeting, the District recommended a placement in a "Level 4" setting where the Student would be separated from her non-disabled peers.  (S. Ex. 56 at 581-82; Tr. at 280-84.)  The District indicated that such a placement would be appropriate because "[the Student] has a great deal of difficulty when there is less predictability."  (S. Ex. 56 at 581.)  The Parent disagreed with this suggestion and inquired why the Student had been wetting herself at school when she had not done so for years at home.  (*Id.*; *see also* Tr. at 422.)  When asked who had the idea for a Level 4 placement, the school's special education director explained that "[i]t was just an idea that was thrown out in the meeting.  And then we threw it out and we knew right away that [the Parent] was opposed."  (Tr. at 250, 280-81.)  She explained that the idea had been discussed among herself, Koep, and counsel for the District.  (*Id.* at 281.)  The Parent testified that she lost trust in the District after this meeting.  (*Id.* at 422.)  At the administrative hearing, the Parent testified as follows:

> [Counsel]:  Is there any possibility at this point that you feel you can restore any kind of trust with these people?
> [The Parent]:  No.
> [Counsel]:  In your opinion does an IEP – a correctly written IEP make a difference at this point?
> [The Parent]:  Not really, no, it really does not.
> [Counsel]:  And why?
> [The Parent]:  We've tried, we've tried to – I've tried to trust, I can't do it, it's gone.

(*Id.* at 432.)

On February 1, 2016, counsel for the District sent a follow-up letter to the parties' January 29, 2016 resolution session. (S. Ex. 56 at 597-99.) In this letter, the District conveyed the terms of its settlement offer to the Plaintiffs, including consulting with Opportunity Matters for training and developing the Student's BIP, potential placement options and use of the Student's private personal care attendant in school, compensatory education, and attorney fees. (*Id.*) Counsel for the District confirmed that "[t]he District proposed to place [the Student] in a separate public day (Setting IV) school in order to provide increased structure and support" and noted the parent's opposition to this recommendation. (*Id.* at 597.) According to the letter, "[a]s a compromise, the District indicated during the resolution session that it was willing to pursue a potential placement for [the Student] in the neighboring Browerville Public Schools." (*Id.* at 597-98.) The Parent opposed this option as well and suggested a placement at Verndale Public Schools. (*Id.* at 598.) However, the District did not have enough information to respond to this suggestion. (*Id.*) The District rejected the Parent's suggestion to have the Student's personal care attendant work with the Student during the school day. (*Id.*) Overall, counsel's letter explains, "the District indicated that it was willing to continue placement within the District and that it would agree to have [the Student's] PCA attend and support at the elementary school on a substitute basis on days when [the Student's] regularly assigned paraprofessional is not available to work." (*Id.*) On February 9, 2016, the District communicated with Collette regarding his participation in assisting the District in the development of a BIP and staff training. (*Id.* at 584-85.) Collette testified that he was

willing to work with the school on staff training and the development of a BIP for the Student.  (Tr. at 667.)

## II.    Procedural History

On January 21, 2016, Plaintiffs filed a complaint and sought an administrative hearing with the Minnesota Department of Education.  (D. Ex. 29 at 0713-16.)  In the complaint, Plaintiffs raised a concern over the District's failure to provide certain educational data:

> Because of her disabling conditions, [the Student] is not able to report what is taking place in the education environment.  [The District] has declined to provide any data that reflects the antecedents to the challenging behavior, the interventions that have been used, and efficacy of those interventions.  Thus, a meaningful discussion regarding [the Student's] challenges as [sic] [the District] and how to intervene with those challenges has yet to be held between the parties.

(*Id.* at 0715.)  Plaintiffs also raised a substantive challenge under the IDEA:

> Because of the lack of experience, training and resources, [the Student] is not receiving a free appropriate public education in the least restrictive environment.  [The District] is unable or unwilling to develop and provide effective interventions for [the Student's] challenging behavior in the school setting and is unable or unwilling to examine and incorporate research-based effective interventions with [the Student].  As a result, [the Student] is denied meaningful access to her education program, services and supports.

(*Id.* at 0716.)  An administrative hearing was held on three days from March 16, 2016 to March 18, 2016.  (*See generally* Tr.)  On April 13, 2016, the ALJ issued his Findings of Fact, Conclusions of Law, and Order.  (*See generally* ALJ Order.)  The ALJ concluded that the Parent did not meet her burden to establish that the District failed to provide the

Student a free appropriate public education ("FAPE") under the IDEA. (*Id.* at 13.) Thus, the ALJ dismissed the Parent's complaint and denied any requested relief. (*Id.* at 13, 18.)

Plaintiffs initiated this case on June 13, 2016 by filing a Complaint in federal district court. (Doc. No. 1 ("Compl.").) Plaintiffs have twice amended their complaint. (*See* Doc. Nos. 5 ("Am. Compl."), 18 ("Second Am. Compl.").) In the Second Amended Complaint, Plaintiffs assert an administrative appeal of the ALJ's Order alongside multiple alleged violations of federal and state law. (*See generally* Second Am. Compl.) Specifically, Plaintiffs assert the following claims: (1) appeal of the administrative decision under the IDEA (Count I); (2) violation of the Americans with Disabilities Act (Count II); (3) violation of Section 504 of the Rehabilitation Act (Count III); (4) Negligence and Negligence Per Se (Count IV); (5) Intentional Torts, including assault, battery, and intentional infliction of emotional distress (Count V); (6) Breach of Contract (Count VI); and violation of the Minnesota Government Data Practices Act (Count VII). (*Id.* at 27-37.) The present motions and order address only Count I of Plaintiffs' Second Amended Complaint.

## DISCUSSION

## I.   The IDEA

States that accept federal funding under the IDEA must make available to every child with a disability in their state "[a] free appropriate public education." 20 U.S.C. § 1412(a)(1)(A). The IDEA defines a FAPE as "special education and related services that" meet specific statutory requirements, including being implemented consistent with the student's IEP. 20 U.S.C. § 1401(9). As the Supreme Court recently reiterated, "The

IEP is 'the centerpiece of the statute's education delivery system for disabled children.'"
*Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017)
(quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).  An IEP is "a written statement for
each child with a disability that is developed, reviewed, and revised in accordance with"
the IDEA's requirements.  20 U.S.C. § 1414(d)(1)(A)(i).  The IDEA's procedural
requirements for developing a student's IEP "emphasize collaboration among parents and
educators and require careful consideration of the child's individual circumstances."
*Endrew F.*, 137 S. Ct. at 994.  In addition, "the IDEA requires that children with
disabilities receive education in the regular classroom 'whenever possible.'"  *Id.* at 999
(citation omitted); *see also* 20 U.S.C. § 1412(a)(5)(A) (providing for education of
children with disabilities in the mainstream alongside children without disabilities "[t]o
the maximum extent appropriate").

Pertinent to this case, an IEP must describe "the child's present levels of academic
achievement and functional performance," provide "a statement of measurable annual
goals," explain how the school will measure the student's progress, describe "the special
education and related services and supplementary aids and services . . . to be provided to
the child, . . . and a statement of the program modifications or supports for school
personnel," provide "an explanation of the extent, if any, to which the child will not
participate with nondisabled children in the regular class," and identify "the anticipated
frequency, location, and duration of . . . services and modifications" referenced above.
20 U.S.C. § 1414(d)(1)(A)(i).  The IEP's description of modifications must be geared
toward assisting the child "to advance appropriately toward attaining the annual goals;

. . . to be involved in and make progress in the general education curriculum . . . and to participate in extracurricular and other nonacademic activities; and . . . to be educated and participate with other children with disabilities and nondisabled children." *Id.* § 1414(d)(1)(A)(i)(IV).

An "IEP Team" must be convened in accordance with specific procedures to facilitate the development of the student's IEP. *See id.* §§ 1414(d)(1)(B)-(C), 1414(d)(3). There are a number of statutory requirements outlining the relevant considerations the IEP Team must address when formulating the IEP. *See id.* § 1414(d)(3)(A)-(B). Most relevant here, "in the case of a child whose behavior impedes the child's learning or that of others," the IEP Team is required to "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." *Id.* § 1414(d)(3)(B). The IEP Team must review and revise the IEP at least annually and under other specified circumstances to address necessary changes. *Id.* § 1414(d)(4).

Parents who are dissatisfied with the development of their child's IEP or the provision of a FAPE to such child may file a complaint and pursue a state administrative hearing. *Id.* § 1415(b)(6), 1415(f)(1)(A). Before this hearing, the parties must participate in a resolution session or agree to waive this requirement. *Id.* § 1415(f)(1)(B); 34 C.F.R. § 300.510. A party may appeal the administrative decision by initiating a civil action in state or federal court. 20 U.S.C. § 1415(i)(2).

In evaluating a district's IDEA liability, "a district court must engage in a two-part inquiry: It must first determine whether the school district followed the procedures set forth in the IDEA, and then it must decide whether the resulting IEP was 'reasonably

calculated to enable the child to receive educational benefit.'" *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 804 (8th Cir. 2011) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206-07 (1982)). When a school district has met these standards, it "has complied with the obligations imposed by Congress and the courts can require no more." *Id.* (quoting *Rowley*, 458 U.S. at 207).

The Supreme Court first articulated the proper test to evaluate whether a FAPE has been provided in *Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley*, 458 U.S. 176 (1982). *See Endrew F.*, 137 S. Ct. at 994. There, it held "that this requirement is satisfied, and a child has received a FAPE, if the child's IEP sets out an educational program that is 'reasonably calculated to enable the child to receive educational benefits.'" *Id.* at 995-96 (quoting *Rowley*, 458 U.S. at 207). Earlier this year, the Supreme Court clarified the *Rowley* standard and explained that "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999. In *Endrew F.*, the Supreme Court emphasized that the development of an IEP is a "fact-intensive exercise" intended to "be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." *Id.* The IEP must establish an "educational program [that is] appropriately ambitious in light of [the child's] circumstances," and should give the child "the chance to meet challenging objectives." *Id.* at 1000.

The Supreme Court rejected the Tenth Circuit's standard requiring "merely more than *de minimis*" educational benefits and noted that its newly articulated "standard is markedly more demanding." *Id.* However, the Supreme Court also acknowledged that those evaluating IEPs "must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* at 999. In addition, it rejected the petitioners' proposal to determine that a FAPE requires "an education that aims to provide a child with a disability opportunities to achieve academic success, attain self-sufficiency, and contribute to society that are substantially equal to the opportunities afforded children without disabilities." *Id.* at 1001. It also declined to adopt "a bright-line rule" and emphasized the case-specific nature of evaluating whether an IEP affords a FAPE. *Id.*

## II.     Plaintiff's Motion to Supplement the Administrative Record

The IDEA provides that a court reviewing a state administrative decision "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). While acknowledging that the IDEA permits the admission of supplemental evidence, the Eighth Circuit has held that "a party seeking to introduce additional evidence at the district court level must provide some solid justification for doing so." *Indep. Sch. Dist. No. 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 560 (8th Cir. 1996) (quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 996 (1st Cir. 1990)). It has also noted that "[r]endering a decision on the record compiled before the administrative

48

agency . . . is the norm." *West Platte R-II Sch. Dist. v. Wilson ex rel. L.W.*, 439 F.3d 782, 785 (8th Cir. 2006).

"In the absence of 'solid justification' for the submission of additional evidence, the administrative hearing process would be undermined and would render meaningless Congress' admonition that the Courts ascribe 'due weight' to those underlying proceedings." *Moubry ex rel. Moubry v. Indep. Sch. Dist. No. 696 (Ely)*, 951 F. Supp. 867, 900 (D. Minn. 1996) (quoting *Roland M.*, 910 F.2d at 996). The following have been identified as potential "reasons for supplementation" by the First Circuit as well as another court in this District: "gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing." *Id.* (quoting *Town of Burlington v. Mass. Dep't of Educ.*, 736 F.2d 773, 790 (1st Cir. 1984)).

Plaintiffs seek to introduce supplemental evidence into the record consisting of "evidence that was unavailable at the time of the administrative hearing but relevant to the claims the Plaintiffs raised in their appeal of the underlying special education administrative hearing." (Doc. No. 50 at 1.) Plaintiffs argue that "the inexplicable regression" in the Student's fourth-grade year "becomes explicable" when evaluated "[w]ithin the context of the supplemental evidence reflecting a continued pattern of physical abuse and discipline." (*Id.*) According to Plaintiffs, the evidence was unavailable "because it was not reported until after the administrative decision was provided." (*Id.* at 2.) Plaintiffs argue that "[t]he supplemental evidence Plaintiffs seek

the Court to consider concerns relevant events occurring during and subsequent to the administrative hearing that were unknown to the Plaintiffs." (*Id.* at 7.) Plaintiffs contend that solid justification exists for permitting the supplemental evidence because "[t]he proposed supplemental evidence is relevant and probative to the issues presented in the administrative hearing" and "is entirely new evidence" that illustrates the student's fourth-grade year at the District. (*Id.* at 9.) Specifically, Plaintiffs argue, the proposed additional evidence of maltreatment shows "a continued pattern of physical abuse and discipline of [the Student] which contributed to her deterioration and regression at school." (*Id.*) Further, the evidence of the Student's current progress in her new school "reflect a student who is again making progress" and participating successfully in an integrated setting. (*Id.*)

Defendant opposes Plaintiffs' motion to supplement, arguing that Plaintiffs fail to establish any justification to supplement the record with post-hearing information. Defendant submits that merely identifying new information does not show a solid justification. First, Defendant argues that the evidence relating to alleged maltreatment of the Student "are not relevant to the administrative decision and did not relate in any way to the District's implementation of [the Student's] IEP." (Doc. No. 41 at 3.) Defendant also points out that whether the alleged maltreatment occurred is disputed and notes that the Court will not have the opportunity to evaluate this evidence through live testimony. (*Id.*) Second, Defendant argues that the record of the Student's current academic progress at a new district "is wholly irrelevant to the administrative proceeding." (*Id.*) Defendant suggests Plaintiffs should not be permitted to "indefinitely expand the scope of

50

the record" through such evidence developed after the administrative hearing. (*Id.* at 4.)

Finally, Defendant argues that if the Court chooses to permit supplementation, it should consider additional evidence offered by Defendant (as well as evidence not yet developed through discovery) in order to provide a complete and accurate record.

The Court declines to permit supplementation of the voluminous record in this case because Plaintiffs have failed to establish a solid justification for doing so. First, although Plaintiffs argue that the student testimony regarding Leyh's alleged physical abuse of the Student explains the inexplicable regression in the Student's behaviors, this argument presumes without support that there is in fact a demonstrable connection between Leyh's treatment of the Student and her behaviors. The record lacks sufficient evidence to support such a conclusion, and the Court declines to speculate on this issue. Further, the proffered student testimony concerns events that were not made known to school administrators at the relevant time periods under review. Finally, to the extent Plaintiffs seek to offer the student testimony to support that the District failed to document removals of the Student from the mainstream, the evidence does not reliably support this proposition as the Student testimony lacks detail regarding the alleged removals and presumes that such removals were not in conformity with the Student's established daily schedule or IEP.

Second, the Court declines to expand the administrative record to include the Student's post-hearing progress at her new school. The Eighth Circuit has indicated that reviewing courts should not "judge [a student's] IEPs in hindsight." *K.E. ex rel. K.E.*, 647 F.3d at 808. It explained, "'An IEP is a snapshot, not a retrospective,' and we must

'take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated.'" *Id.* (quoting *Roland M.*, 910 F.2d at 992). Consistent with this view, it has affirmed a district court's denial of supplementation where the proposed evidence consisted of "the progress and status of [the student] subsequent to the administrative hearing." *West Platte R-II Sch. Dist.*, 439 F.3d at 785. The Court similarly declines to permit such evidence here.

In short, the evidence Plaintiffs offer to supplement the administrative record is not sufficiently relevant to the administrative proceeding. Significantly, however, the admission of this evidence would not materially alter the Court's analysis of Plaintiffs' claims. Plaintiffs have failed to establish a solid justification for the admission of this evidence. Giving due weight to the administrative proceedings and recognizing that "[r]endering a decision on the record compiled before the administrative agency . . . is the norm," *id.*, the Court respectfully denies Plaintiffs' Motion to Supplement the Administrative Record.

## III.    Plaintiffs' Motion for Judgment on the Supplemented Administrative Record

### A.    Legal Standard

When reviewing state administrative decisions under the IDEA, "[t]he district court must make its decision independently, based on a preponderance of the evidence, as to whether the IDEA was violated." *Sneitzer v. Iowa Dep't of Educ.*, 796 F.3d 942, 948 (8th Cir. 2015). Thus, "the district court must 'independently determine whether the child [in question] has received a FAPE.'" *K.E. ex rel. K.E.*, 647 F.3d at 803 (quoting *CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 636 (8th Cir. 2003)). At the same time,

courts should give the ALJ's decision "due weight." *Id.* (quoting *Indep. Sch. Dist. No. 283*, 88 F.3d at 561). The Eighth Circuit has emphasized that the court's "review is not necessarily de novo," and that a court "should not substitute its judgment for that of the school officials." *Sneitzer*, 796 F.3d at 948.

The "limited grant of deference" under this standard "is appropriate in IDEA cases because the ALJ 'had an opportunity to observe the demeanor of the witnesses and because a [district] court should not substitute its own notions of sound educational policy for those of the school authorities that [it] review[s].'" *K.E. ex rel. K.E.*, 647 F.3d at 803 (quoting *CJN*, 323 F.3d at 636). The Eighth Circuit has noted that "[t]his somewhat 'unusual' standard of review is less deferential than the substantial-evidence standard commonly applied in federal administrative law." *Id.* (quoting *Indep. Sch. Dist. No. 283*, 88 F.3d at 561). "Whether a child has received a FAPE is a mixed question of law and fact." *Id.* at 804. A court may render a decision on the administrative record even where "disputed issues of material fact" are present. *Indep. Sch. Dist. No. 283*, 88 F.3d at 561. Here, the burden is on the Plaintiffs as they are "challenging the IEP" and "the outcome of the administrative . . . decision." *Lathrop R-II Sch. Dist. v. Gray ex rel. D.G.*, 611 F.3d 419, 423 (8th Cir. 2010); *Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 658 (8th Cir. 1999).

## B.     Deference to the ALJ's Decision

Plaintiffs argue that the Court should not afford deference to the ALJ's findings of fact or the decision reached. According to Plaintiffs, the ALJ made findings that are erroneous or inconsistent with the weight of the evidence. Plaintiffs submit that the ALJ

disregarded key facts.  Plaintiffs ask the Court to give no weight to the ALJ's decision

and conduct a *de novo* review of the applicable facts and law.  In particular, Plaintiffs

suggest that the Court follow a recent Ninth Circuit decision which suggests that whether

to defer to the ALJ's factual findings "is within the Court's discretion and should be

limited to those findings that are 'thorough and careful.'"  (Doc. No. 54 at 2-3 (quoting

*M.C. ex rel. M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 (9th

Cir. 2017), *petition for cert. filed*, No. 17-325 (Aug. 31, 2017)).)  Under this standard,

Plaintiffs argue, "[t]he administrative decision in this case was neither thorough nor

careful and, thus should not be granted deference in general."  (*Id.* at 3.)  For example,

Plaintiffs point out that the ALJ concluded the District was documenting removals when

the Student's special education teacher testified that there was no such record.  In

particular, Plaintiffs ask the Court to reject the ALJ's credibility determinations because

they are inconsistent with the Parent's testimony which was not contested.  Plaintiffs also

take issue with the ALJ's reframing of the issues presented for administrative decision.

Defendant argues that the Court should apply this Circuit's established standard of

review for administrative appeals under the IDEA, giving the ALJ's decision due weight

deference.  Defendant points out that the ALJ had the opportunity to observe witnesses

testifying firsthand in the three-day administrative hearing and emphasize that he

reviewed a substantial record in reaching his conclusions.  Defendants assert that

"Plaintiffs have offered no authority—aside from their proffered disagreements with the

ALJ's factual conclusions—to support their contention that a district court may disregard

the deferential standard of review."  (Doc. No. 43 at 19.)  Regarding the ALJ's legal

conclusions, Defendant argues that Plaintiffs' "argument . . . is simply a substantive complaint regarding the ALJ's ultimate legal conclusions under the IDEA." (*Id.*) Plaintiffs' disagreement with these legal conclusions, Defendant argues, cannot change the due weight deference owed to the ALJ's decisionmaking.

The Eighth Circuit has noted that "[o]ther circuits have applied [the IDEA's] rather unusual statutory standard in somewhat different fashions." *Indep. Sch. Dist. No. 283*, 88 F.3d at 561. It has suggested that a district court should defer to findings based on firsthand observation of witnesses but may properly reject administrative conclusions that fail to give proper weight to educators' views. *Id.* It has also affirmed a district court's deference to findings arising from an administrative hearing and noted "that on the whole, the record supports the credibility assessments and findings made by the administrative panel and deferred to by the district court." *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1028 (8th Cir. 2003). Thus, the Eighth Circuit appears to recognize that "due weight" deference requires a close analysis of how much deference is "due" with respect to the particular findings and conclusions reached at the administrative level.

Neither wholesale rejection nor blind adoption of the administrative decision comports with the Eighth Circuit's standard for evaluating IDEA appeals. Keeping in mind the deference properly afforded to those findings that are based on the ALJ's opportunity to observe witnesses firsthand and "mindful that [this Court] lack[s] the specialized knowledge and experience necessary to resolve difficult questions of educational policy," *see id.*, the Court has carefully considered the lengthy administrative

record and affords the ALJ's findings and determinations the weight they are properly due.

### C. Procedural Violations

"Congress intended that IDEA's procedural safeguards be enforced so that parents of a handicapped child will have adequate input in the development of the child's IEP." *Indep. Sch. Dist. No. 283*, 88 F.3d at 562. However, procedural violations under the IDEA do not always render an IEP invalid. *K.E. ex rel. K.E.*, 647 F.3d at 804. "An IEP should be set aside only if procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." *Lathrop R-II Sch. Dist.*, 611 F.3d at 424 (quoting *Indep. Sch. Dist. No. 283*, 88 F.3d at 562); *see also* 20 U.S.C. § 1415(f)(3)(E)(ii).

Plaintiffs identify multiple alleged procedural violations to support their claim that the District denied the Student a FAPE under the IDEA. First, Plaintiffs argue that Defendant failed to have a general education or special education teacher at the September 2015 IEP Team Meeting in violation of 20 U.S.C. § 1414(d)(1)(B) and 34 C.F.R. § 300.321. Second, Plaintiffs contend that "[t]he Plaintiffs' procedural rights were violated when [the Parent] was denied information regarding [the Student's] education" in violation of 20 U.S.C. § 1415(b)(1) and 34 C.F.R. §§ 300.613-300.621. (Doc. No. 35 at 24.) Plaintiffs point out that it is particularly important for educators "to maintain and provide accurate information regarding [a] child's education" when the child is non-verbal. (*Id.*) In such circumstances, Plaintiffs argue, "accurate information

is vital to [a parent's] participation on behalf of her child." (*Id.*)  According to Plaintiffs, "[w]ithout the teachers' opinions, information regarding [the Student's] behaviors, the interventions and removals from the mainstream classroom, [the Parent] did not receive adequate information to participate in the development of [the Student's] education program or to agree to more restrictive settings." (*Id.* at 25.)  Specifically, Plaintiffs point out that the District failed to provide data on antecedents to the Student's challenging behaviors, attempted interventions and the Student's response, or the Student's incidents of wetting.  Plaintiffs argue that "[t]he burden to identify [the Student's] regression was shifted onto [the Parent] in the administrative hearing." (*Id.*)  Finally, Plaintiffs argue Defendant violated Plaintiffs' procedural rights by proposing increased time in the special education setting "without a concomitant behavior goal and objectives, as well as supports and services." (*Id.* at 26-27.)

According to Plaintiffs, the District's procedural violations and failure to provide "real time and accurate information" violated the Student's rights under the IDEA.  (Doc. No. 54 at 5.)  Plaintiffs also argue that Defendant disregarded its responsibility to accurately document the Student's education.  Plaintiffs suggest that the ALJ made an inaccurate finding with regard to the District's documentation of the Student's removal from the classroom.  Plaintiffs characterize the District's removal of the Student from her general education classroom as a "unilateral change in [the Student's] mainstream attendance." (*Id.* at 7.)  Plaintiffs also contend that "[the Parent] repeatedly asked for the frequency, duration and location of [the Student's] special education program with a specific concern related to her removals from her mainstream classroom." (*Id.*)

Plaintiffs also point out that the District's FBA did not rely upon observations of the Student in the mainstream setting.

Defendant argues that the District procedurally complied with the IDEA in providing a FAPE to the Student. First, Defendant points out that it is unclear whether the Student's special education teacher attended the September 2015 IEP meeting. Even if she did not, however, Defendant argues that Plaintiff has failed to show that this alleged procedural violation denied the Student a FAPE. In particular, Defendant points out that "[the Parent] approved the revised IEP plan that resulted from the meeting." (Doc. No. 43 at 22.) Second, Defendant argues that the Parent was given the right to review the Student's educational records. In particular, Defendant suggests that the District's FBA was designed to gather and communicate data relevant to the Parent's questions about the Student's behaviors. Defendant notes, "the FBA report identified when and where [the Student] was most frequently experiencing behavioral difficulties, the antecedents to [the Student's] behavioral episodes, and the consequences implemented by staff relating to the challenging behavior." (*Id.* at 23.) Defendant also argues that any delay in providing the raw data to the Parent in the form of behavior charts was not a significant procedural violation that denied the Student a FAPE. Third, Defendant characterizes as "meritless" Plaintiffs' argument regarding the failure to develop a behavioral goal in September 2015. (*Id.* at 24.) Defendant points out that the District conducted an FBA before revising the IEP in December 2015 to incorporate "significant modifications in [the Student's] programing and staff training to address [the Student's] behavioral needs." (*Id.*) Overall, Defendant argues that the District undertook

the necessary procedural steps to respond to the Student's behaviors and amend her IEP: "the District identified that [the Student's] behaviors were escalating in the fall of 2015, completed an extensive study to evaluate those behaviors, and then proposed a modified IEP incorporating what was discerned from the assessment, including a BIP." (*Id.* at 25.)

The ALJ determined that the Parent did not meet her burden to show that Defendant "denied Student a FAPE by failing to appropriately revise her IEP to address her escalating behavioral needs." (ALJ Order at 13.) Specifically, the ALJ concluded that "[t]he IEP team, including Parent, repeatedly met to address concerns about Student's behavior, conducted a new evaluation and considered the results, and made proposed changes to the IEP based, in part, on those results." (*Id.*) The ALJ noted a number of assertions by the Parent that impacted her credibility and undermined her statements regarding undocumented removals. In particular, the ALJ highlighted discrepancies in portions of the record regarding the frequency of the District's phone calls to the Parent. The ALJ determined that "[t]here is a wealth of documentation in the record, including recordings of when Student was removed from class or left school early." (*Id.* at 16.) The ALJ emphasized that Plaintiffs could not meet their burden by making "general accusations and claims of lack of documentation." (*Id.*) The ALJ also found the Parent's credibility to be lacking because she did not choose to have Collette attend the December 2, 2015 IEP team meeting. The ALJ did not specifically address Plaintiffs' claims regarding alleged procedural deficiencies such as the special education teacher's absence at the September 2015 meeting, failure to provide the Parent with documentation of behaviors, or failure to track instances of daytime wetting.

### 1. Teacher's Presence at the September 2015 IEP Team Meeting

First, the Court considers Plaintiffs' argument relating to the September 2015 IEP Team Meeting. The record contains inconsistent information regarding whether Mozis attended the September 2015 IEP Team Meeting, and the ALJ did not make a specific finding about who attended this meeting. However, even if one or more required IEP Team Members were absent from this meeting, those who testified regarding this meeting consistently suggested that those in attendance, including the Parent, agreed on the outcome of this meeting—additional downtime for the Student in the afternoons outside of the mainstream and an FBA to further evaluate the Student's escalating behaviors. Although the Parent later suggested that the afternoon downtime was not a successful strategy, at the time of this IEP Team Meeting, all members agreed this approach was appropriate under the circumstances. The Parent agreed to amend the Student's IEP following this meeting, and explicitly agreed to do so "without convening the entire IEP Team." (D. Ex. 8A.) Even if one or more required members did not attend this meeting, the Court concludes that the record does not support that this minor procedural violation in itself "compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." *Lathrop R-II Sch. Dist.*, 611 F.3d at 424 (quoting *Indep. Sch. Dist. No. 283*, 88 F.3d at 562).

### 2. Access to Student Records

Second, the Court addresses Plaintiffs' arguments relating to the Parent's access to educational data concerning the Student. There are two primary types of data that the

record supports the District had in its possession that was arguably not provided to the Parent in a timely fashion—the District's behavioral charts concerning the Student, and the video of the September 15, 2015 hallway restraint incident.  Plaintiffs also refer to other data that the District did not provide to the Parent because it was not being collected at all—data documenting the District's attempted behavioral interventions and their success, data on removals from the mainstream classroom and the school, and data on the Student's incidents of wetting.  Because Plaintiffs' argument about the failure to collect the data in the latter category overlaps with their substantive arguments that the District denied the Student a FAPE in the least restrictive environment, the Court will focus here on the District's failure to provide data that was in its possession and focus on the missing data in a separate section, below.

States must ensure that procedures permit "[a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a [FAPE] to such child."  20 U.S.C. § 1415(b)(1); *see also* 34 C.F.R. § 300.501(a) ("The parents of a child with a disability must be afforded . . . an opportunity to inspect and review all education records with respect to . . . [t]he identification, evaluation, and educational placement of the child; and . . . the provision of FAPE to the child.").  This obligation extends to "any education records relating to

[children with disabilities] that are collected, maintained, or used by the agency."[5] 34 C.F.R. § 300.613(a). "The agency must comply with a request without unnecessary delay and before any meeting regarding an IEP, [due process hearing], or resolution session . . . , and in no case more than 45 days after the request has been made." *Id.*

The District provided the Parent with the raw data documenting the Student's behaviors—the daily behavior charts—as an enclosure to a letter from the District's counsel dated December 7, 2015. Although the Parent did not have this data prior to the parties' December 2, 2015 IEP Team Meeting, the Parent did have access to the District's FBA which summarized the behaviors documented within the behavior charts. The Parent also had the data in her possession when the District sent its proposed IEP, permitting the Parent to evaluate the IEP's adequacy in the context of this data. The Court concludes that any procedural flaws in the provision of this data were not material and thus do not amount to a FAPE denial under the circumstances.

The Parent's access to the video documenting September 15, 2015 hallway incident presents a closer question as the Parent was not permitted to view the video until the parties' resolution session. Thus, the Parent did not have this video until after the December 2015 IEP Team Meeting and after the District had sent two proposed IEPs seeking the Parent's approval. The District had earlier attempted to negotiate the Plaintiffs' access to the video, but relied on the arguable need for redaction to delay the

---

[5] "Education records" is defined as "those records, files, documents, and other materials which . . . contain information directly related to a student; and . . . are maintained by an educational agency or institution or by a person acting for such agency or institution." *See* 34 C.F.R. § 300.611(b); 20 U.S.C. § 1232g(a)(4)(A).

Parent's access to this data. Although the record is not completely clear regarding what contributed to the long delay in the Parent accessing the video, the Court concludes that Plaintiffs have not established a material procedural violation by this delay. Plaintiffs have not articulated how the Parent's delayed viewing of this video "compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." *Lathrop R-II Sch. Dist.*, 611 F.3d at 424 (quoting *Ind. Sch. Dist. No. 283*, 88 F.3d at 562). Thus, this procedural violation does not support a conclusion that the District denied the Student a FAPE.

### 3.     Failure to Develop a Behavioral Goal

Finally, the Court addresses the Plaintiffs' argument that the District proposed increased time outside of the mainstream without providing a corresponding behavioral goal. The Eighth Circuit has explained that "[t]he IDEA does not . . . require an IEP to create specific goals with regard to behavior. If a behavior impedes a child's learning, the IEP team need only '*consider*, when appropriate, strategies, including positive behavioral interventions, strategies, and supports to address that behavior[.]'" *Id.* (quoting 20 U.S.C. § 1414(d)(3)(B)(i)). In response to the Student's increasing behaviors and following the September 15, 2015 incidents, the District convened an IEP Team Meeting and agreed to conduct an FBA to develop strategies to address the Student's behaviors. Following this meeting, the parties also agreed to increase the Student's segregated time by forty-five minutes in an attempt to reduce behaviors in the afternoon. The District then followed up in December 2015 by proposing an IEP that included a

behavioral goal as well as a BIP. In these circumstances, the Court cannot conclude that the District's failure to develop a behavioral goal when amending the Student's IEP in September 2015 amounted to a procedural violation or a denial of a FAPE.

### D. Substantive Challenges

Plaintiffs also argue that the District denied the Student a FAPE in the least restrictive environment as required under the IDEA. According to Plaintiffs, the District increased the Student's time in a segregated setting without identifying a behavioral goal or objectives and without "provid[ing] supports and services in the mainstream setting to address [the Student's] escalating behavior." (Doc. No. 35 at 27.) Specifically, Plaintiffs make three arguments to support the District's liability under this requirement. First, Plaintiffs argue that the District materially deviated from the Student's fourth-grade IEP resulting in the Student's failure to obtain meaningful benefit from her education. Specifically, Plaintiffs argue that the discipline and removal of the Student from the general education classroom "without regard to the IEP, her class schedule or recordation of the removals" demonstrate a material deviation from the Student's IEP and a violation of the IDEA. (*Id.* at 29.) Second, Plaintiffs argue that the District's use of restraints and discipline of the Student violated her rights. In particular, Plaintiffs argue that the September 15, 2015 restraints were imposed by untrained staff and in violation of Minnesota statutes governing the use of restraints on students in schools. Third, Plaintiffs argue that Defendants improperly removed the Student from the mainstream setting and failed to document such removals. Plaintiffs also assert that the District proposed a more restrictive placement for the Student "from a level II to a level III

program without first introducing and attempting interventions in her level II setting."

(Doc. No. 54 at 1.)

Defendant argues that the District provided the Student with an IEP that was "reasonably calculated to result in educational benefit." (Doc. No. 43 at 26.) Defendants emphasize that "the district court must be careful not to require more from an IEP because the IDEA does not require that a school either maximize a student's potential or provide the best possible education at public expense." (*Id.* (quoting *Fort Osage R-1 Sch. Dist. v. Brandon Sims ex rel. B.S.*, 641 F.3d 996, 1003 (8th Cir. 2011)).) Defendant argues that the administrative record supports the ALJ's conclusion that the District appropriately responded to the Student's behaviors by evaluating her and proposing corresponding changes to her IEP. Defendant also points out that the Parent largely agreed with many of the school's proposals and recommendations developed throughout the Student's fourth-grade year. With respect to the amount of the Student's time in the mainstream, Defendant argues that "[t]he record indicates that the District appropriately evaluated and determined the level of mainstream time versus segregated time to match the nature of [the Student's] disability, and her behavioral and educational needs." (*Id.* at 31.) Defendants acknowledge that the District's proposals in September and December 2015 reduced the Student's time in the mainstream environment but argue that Defendant "adequately assessed [the Student's] educational and behavioral needs and designed a schedule that maximized her time in the mainstream classroom to the extent appropriate." (*Id.* at 31-32.) With regard to the District's implementation of the Student's IEP, Defendant asks the Court to affirm the ALJ's conclusion that the District did not

materially deviate from the Student's IEP.  In particular, the District argues that the September 15, 2015 restraint incidents did not amount to a denial of FAPE or a failure to materially implement the IEP.  Defendant emphasizes that "the use of physical restraints alone does not automatically equate to a denial of FAPE."  (*Id.* at 33.)  The District also argues that the removals of the Student from the mainstream setting were not inconsistent with a proper implementation of her IEP.  Defendant notes, "[a]lthough Plaintiffs complain of [the Student's] removal from the mainstream setting, Plaintiffs fail to acknowledge that [the Student's] IEPs provided for this very remedy should [the Student's] behavior become disruptive."  (*Id.* at 36.)  Defendant also argues that the record does not support the Parent's suggestion that the District failed to record removals of the Student from the mainstream classroom or from school and point to the ALJ's findings on this issue.  Defendant also points to the Parent's unsupported testimony about being called to pick up the Student from school.

The ALJ concluded that Plaintiffs failed to establish that Defendant violated the Student's rights under the IDEA by not providing a FAPE.  Regarding implementation of the IEP, the ALJ determined that "Parent has not shown there was any failure to implement the IEP."  (ALJ Order at 15.)  The ALJ specifically addressed Plaintiffs' arguments regarding the Student's access to the mainstream setting.  The ALJ noted that the Student had exhibited challenging behaviors since November 2013 and that her IEPs had resulted in "[d]ifferent levels of inclusion . . . over the last few years . . . , including the provision to remove her from the classroom if she is disruptive."  (*Id.*)  The ALJ determined that the District followed these portions of the IEP in the Student's

fourth-grade year and "through the IEP team, . . . made additional changes to this plan and proposed additional changes to balance Student's needs and her inclusion in the mainstream setting." (*Id.* at 15-16.) The ALJ opined: "It may be, as her academic achievement falls further behind that of her peers, and her frustration and resulting behavior grows, that more segregation is necessary to enable her to meet both her functional and academic annual goals." (*Id.* at 16.) Overall, the ALJ concluded that the record failed to support that proposing to place the Student into a more restrictive setting was improper.

The ALJ also addressed the September 15, 2015 restraint incidents, concluding that they "were not failures to implement the IEP." (*Id.* at 17.) The ALJ acknowledged that the staff members' response to the Student's conduct in the hallway may have been improper, but he explained that "[t]he IEP simply did not address this kind of behavior because it had never happened before." (*Id.*) He also emphasized that the District followed up on this situation by holding an IEP team meeting, amending the IEP, and conducting an FBA to assess behaviors and develop interventions.

Finally, the ALJ concluded that the District acted appropriately to revise the Student's IEP and that the Parent had not demonstrated that the proposed IEPs "were not reasonably calculated to enable Student to be involved in and make progress in the general education curriculum and progress toward her annual goals." (*Id.*) In short, the ALJ explained, "[t]he School District was following the requirements of the law." (*Id.*) The ALJ acknowledged that the "Student's lack of progress toward her annual goals is clearly troubling" and pointed out how the goals had not been significantly changed for

years.  (*Id.*)  However, the ALJ determined that the evidence did not support that the District's response to the Student's behaviors caused this "questionable progress."  (*Id.*)

### 1.    Material Deviation From the IEP

Along with procedural challenges to the IEP process and claims that an IEP was substantively flawed, students and their parents may assert claims under the IDEA based on a school's alleged failure to properly implement an agreed-upon IEP.  The Fifth Circuit has identified the following standard for courts evaluating such claims:

> [T]o prevail on a claim under the IDEA, a party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP. This approach affords local agencies some flexibility in implementing IEP's, but it still holds those agencies accountable for material failures and for providing the disabled child a meaningful educational benefit.

*Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000); *see also Neosho R-V Sch. Dist.*, 315 F.3d at 1027 n.3 (noting *Bobby R.*'s holding "that a party who is challenging the implementation of an IEP must demonstrate that the school authorities failed to implement a substantial or significant provision of the IEP").

The Ninth Circuit has also adopted the materiality standard as applicable to implementation challenges under the IDEA.  *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007).  It explained that "[a] material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP."  *Id.*  In adopting this holding, however, the Ninth Circuit emphasized that "IEPs are clearly binding under the IDEA,

and the proper course for a school that wishes to make material changes to an IEP is to reconvene the IEP team pursuant to the statute—not to decide on its own no longer to implement part or all of the IEP." *Id.* Where an IEP requires specific hours of instruction, relevant evidence includes, for example, teacher testimony regarding the quantity of services actually provided. *See id.* at 823.

The Court concludes that the ALJ did not err in concluding that Plaintiffs failed to establish that the District materially deviated from the Student's applicable IEPs in her fourth-grade year. To support the contention that the Student's IEP was not materially implemented, Plaintiffs point to evidence that the Student was not in her mainstream classroom at designated times according to three e-mail exchanges between Mozis and Flock, as well as evidence relating to the discipline against the student such as the imposition of restraints, suspensions, and removals from school. Applying the preponderance of the evidence standard and recognizing Plaintiffs' burden, the Court concludes that these examples fail to demonstrate a "fail[ure] to implement substantial or significant provisions of the IEP." *Bobby R.*, 200 F.3d at 349. As the ALJ noted, this is particularly true in light of the IEPs' provisions providing that the Student could be removed from the mainstream classroom if necessary to avoid disruption.

### 2.    Imposition of Restraints

In an IDEA case involving the repeated use of restraints and seclusion allegedly imposed in violation of Minnesota law, the Eighth Circuit explained, "[w]e of course very much regret that [the student] was subject to an increased amount of restraint . . . , but that fact alone does not make his education inappropriate within the meaning of the

IDEA." *CJN*, 323 F.3d at 639.  To the extent Plaintiffs argue that the September 15, 2015 incidents, standing alone, support a finding that the District denied the Student a FAPE, the Court concludes that the ALJ correctly determined that these incidents did not constitute a material failure to implement the Student's IEP.  To be sure, the Court does not condone the application of restraints against students with disabilities by untrained staff in circumstances where such restraints are not warranted.  However, the Court expressly declines to conclude here that the September 15, 2015 incidents violated any relevant Minnesota laws governing the use of restraints in schools.  Even if there were such a violation, it would not support the conclusion that the District denied the Student a FAPE in her fourth-grade year.  *Cf. CJN*, 323 F.3d at 639 (noting, in the context of analyzing "purported violations of Minnesota rules governing behavioral interventions" the proposition "that minor 'procedural and technical deficiencies in the IEPs' cannot support a claim that a FAPE has been denied" (quoting *Indep. Sch. Dist. No. 83*, 88 F.3d at 562)).  Thus, giving due weight to the ALJ's treatment of this issue, the Court affirms the ALJ's conclusions with regard to the imposition of restraints against the Student.

### 3.  Least Restrictive Environment

Finally, the Court considers Plaintiffs' argument that the Student was not provided a FAPE in the least restrictive environment by being removed from the mainstream setting.  The IDEA requires that "[t]o the maximum extent appropriate, children with disabilities . . . [be] educated with children who are not disabled."  20 U.S.C. § 1412(a)(5)(A).  Further, "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment" should be utilized

"only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* The Eighth Circuit has acknowledged that "the IDEA expresses a strong preference in favor of disabled children attending regular classes with children who are not disabled." *CJN*, 323 F.3d at 641; *see also Neosho R-V Sch. Dist.*, 315 F.3d at 1026 ("Congressional policies indicate a preference for educating disabled children in a mainstreamed classroom whenever possible.").

With regard to removals from the mainstream, the Eighth Circuit has explained that "[a] student may be removed from the regular classroom . . . if it is necessary for the safety of other students or for the disabled child." *M.M. v. Dist. 0001 Lancaster Cty. Sch.*, 702 F.3d 479, 485 (8th Cir. 2012). Removals are proper under the IDEA "when 'the handicapped child would not benefit from mainstreaming,' when 'any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting,' and when 'the handicapped child is a disruptive force in the non-segregated setting.'" *Pachl ex rel. Pachl v. Seagren*, 453 F.3d 1064, 1068 (8th Cir. 2006) (quoting *Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983)). In an analogous case, the Eighth Circuit noted it relevant that the student's "behavior intervention plan allowed him to be removed from class if he was disruptive or aggressive." *M.M.*, 702 F.3d at 488.

When behavioral challenges affect a student's progress under an IEP, a school district must only make a "good faith effort" to address those issues. *See Lathrop R-II Sch. Dist.*, 611 F.3d at 426. Thus, "even if 'more positive behavior interventions could

have been employed, that fact is largely irrelevant' where the school district made a 'good faith effort' to help the student achieve the educational goals outlined in his IEP." *Id.* (quoting *CJN*, 323 F.3d at 638). A school district's deployment of "an FBA, behavioral strategies, and staff training" demonstrate adequate good faith attempts to address student behaviors. *Id.*

In light of the limited evidence in the record relating to the consistency of the Student's removal from the mainstream,[6] the Court concludes that the Plaintiffs have not met their burden to establish by a preponderance of the evidence that the District failed to serve the Student in the least restrictive environment consistent with her IEP. Once again, the Court emphasizes that the Student's IEPs as written permitted removals when necessary to avoid disruption in the mainstream classroom. This provision is consistent with the circumstances under which removals are permitted according to Eighth Circuit standards. At relevant points in the Student's fourth-grade year, the District proposed changes to increase the Student's time in the special education environment in response to increasing behaviors. Plaintiffs have failed to establish that the District's proposals in this regard were inconsistent with the IDEA's preference for mainstreaming children with disabilities "[t]o the maximum extent appropriate." *See* 20 U.S.C. § 1412(a)(5)(A).

---

[6]     The Court addresses the alleged failure to document removals from the mainstream environment separately, below.

### E. Failure to Document Behavioral Interventions and Removals

A consistent theme throughout this IDEA case is the alleged lack of documentation by the District precluding the Parent from receiving full information about the Student's education. According to Plaintiffs, this lack of documentation prevented the Parent from fully participating in the development of a new IEP for the Student in her fourth-grade year. It also impacted the Parent's efforts to enforce the IEP as written because the Parent could not verify the quantity of services actually being provided to the Student under the agreed-upon IEP. Most critically, Plaintiffs complain of inadequate documentation of the District's attempted behavioral interventions and numerous undocumented removals from the mainstream environment that Plaintiffs allege deprived the Student of a free appropriate public education in the least restrictive environment.[7]

The Court concludes that any inadequacies in the District's documentation of the Student's education do not amount to an actionable procedural violation under the IDEA. The Court is bound by the established "two-part inquiry" under the IDEA which dictates that the Court's review is limited as follows: "It must first determine whether the school district followed the procedures set forth in the IDEA, and then it must decide whether the resulting IEP was 'reasonably calculated to enable the child to receive educational benefit.'" *K.E. ex rel. K.E.*, 647 F.3d at 804 (quoting *Rowley*, 458 U.S. at 206-07). Importantly, "[i]f these requirements are met, the [school district] has complied with the

---

[7]    The Court also notes that the record demonstrates that the District did not consistently document incidents of wetting as requested by the Student's physician or phone calls to the Parent to pick up the Student.

obligations imposed by Congress and the courts can require no more." *Id.* (quoting

*Rowley*, 458 U.S. at 207). To be sure, districts must ensure that parents have "[a]n

opportunity . . . to examine all records relating to [their] child," 20 U.S.C. § 1415,

including "any education records relating to their children that are collected, maintained,

or used by the agency," 34 C.F.R. § 300.613(a). However, Plaintiffs have not

identified—and the Court has been unable to locate—any affirmative obligations within

the IDEA requiring schools to generate records upon a parent's request.[8]

Plaintiffs direct the Court to the Ninth Circuit's recent decision in *M.C. ex rel.*

*M.N. v. Antelope Valley Union High School District*, 858 F.3d 1189, but that case is

distinguishable. The court in *M.C.* found the district liable for failing to accurately

document the services that were offered within the IEP. *See id.* at 1195-99, 1201. This

result flowed from the federal statutory requirement that "[t]he IEP must specify 'the

anticipated frequency, location, and duration of [education] services.'" *Id.* at 1197

(quoting 20 U.S.C. § 1414(d)(1)(A)(i)(VII)). The court also explained that "[w]hen a

student requires 'a particular device or service' California requires that the IEP 'include a

statement to that effect.'" *Id.* at 1198 (quoting Cal. Educ. Code § 56341.1(b)(5), (c)).

Here, in contrast, Plaintiffs have not identified a statutory basis to support that the failure

to document mainstream removals (or other requested information about the Student's

---

[8]     In the context of an evaluation of a student, the IDEA establishes specific statutory
requirements for school districts to generate additional data as determined by the IEP
Team in collaboration with parents. *See* 20 U.S.C. § 1414(c). However, Plaintiffs have
not suggested that these provisions apply to the Parent's requests for records in this case,
and the record fails to support that the District did not follow these requirements in
conducting its evaluation of the Student in her fourth-grade year.

education) amounts to an actionable procedural violation under the IDEA. Thus, there is no basis on which the Court can conclude that the District is liable for any procedural harm suffered by the Plaintiffs on this record.

Even so, the Court notes that the District could have done more to document the Student's education in this case. Contrary to the ALJ's analysis of this issue, the record suggests that the District did not consistently document the Student's removals from the mainstream classroom. Although such removals may have been noted on various occasions in places such as the behavior charts or the communication notebook, the record does not support that the District was documenting these removals with any consistency. Indeed, Flock specifically testified that there was no record of time spent in the mainstream environment, and Mozis explained that she did not record removals. In addition, although the District developed some data on the Student's behaviors, antecedents, and interventions through its FBA, none of the observations conducted to complete the FBA involved observing the Student in her mainstream classroom. Particularly in the circumstances present here—where an IEP provides school staff discretion to remove a student from the mainstream environment based on disruptive behaviors and the student is non-verbal—it is reasonable for a parent to seek specific information about the extent of such removals and the school's attempts to respond to behaviors in the mainstream with appropriate interventions before the removals occurred. Notwithstanding these considerations, however, the Court concludes that the District did not violate the IDEA.

### F.    Compensatory Education

In light of the Court's conclusion, above, that Plaintiffs have not established an actionable violation of the IDEA, the Court need not evaluate the Plaintiffs' right to compensatory education for the Student's fourth-grade year.

## CONCLUSION

Having carefully reviewed the lengthy administrative record in this matter, the Court concludes that the ALJ did not err in concluding that Plaintiffs failed to meet their burden to demonstrate that the District violated the IDEA. Plaintiffs identify multiple alleged procedural and substantive violations that arguably inhibited the Student's right to a FAPE during her fourth-grade year, but the Court concludes that none of these alleged violations supports imposing liability against the District. The Court acknowledges Plaintiffs' complaints regarding the District's failure to consistently document various aspects of the Student's education, as well as the Student's apparent deterioration in skills during her fourth-grade year and the lack of progress made under her existing IEPs. However, the record does not support the imposition of liability under the IDEA against the District in this matter. Therefore, the Court respectfully denies Plaintiffs' motions.

## ORDER

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Plaintiff's Motion to Supplement the Administrative Record (Doc. No. [36]) is **DENIED**.

2.      Plaintiff's Motion for Judgment on the Supplemented Administrative

Record (Doc. No. [33]) is **DENIED**.

Dated:  September 29, 2017                s/Donovan W. Frank
                                          DONOVAN W. FRANK
                                          United States District Judge